UNITED STATES of America, Plaintiff-Appellee,

v.

Alfredo REYNOSO–ULLOA, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Richard Wayne MUMMERT, Defendant-Appellant.

Nos. 76–1466 and 76–1500.

United States Court of Appeals, Ninth Circuit.

Jan. 25, 1977.

Lewis A. Wenzell (argued), San Diego, Cal., for defendant-appellant in 76–1466.

Peter J. Hughes (argued), San Diego, Cal., for defendant-appellant in 76–1500.

Stephen G. Nelson, Asst. U. S. Atty. on the brief, Terry J. Knoepp, U. S. Atty., Stephen G. Nelson, Asst. U. S. Atty., argued, San Diego, Cal., for plaintiff-appellees in 76–1466 and 76–1500.

Before CHAMBERS and MERRILL, Circuit Judges, and JAMESON,* District Judge.

JAMESON, District Judge:

Appellants were convicted on eight counts of an indictment charging appellants and four co-defendants with distribution of heroin, possession with intent to distribute, use of the telephone to facilitate distribution, and conspiracy, in violation of 21 U.S.C. §§ 841, 843, 846, 952, 960 and 963. The charges arose from a conspiracy to smuggle heroin from Mexico and distribute it in the United States. Both appellants raise the issue of entrapment and the propriety of the entrapment instructions. Appellant Mummert additionally contends that alleged perjury by a Government informant and prejudicial testimony given by a Government agent require reversal of his conviction.

### Statement of Facts

The critical issues on appeal center on the activities of Michael Sheen, a Government informant who had previously worked for the Drug Enforcement Administration (DEA) in Seattle, Washington. Sheen had worked with DEA agents Flego and Zweiger in "making" a number of drug cases in the Seattle area. Following threats on his life, in April, 1975, Sheen moved to California where he secured a job selling cars at a Ford dealership owned by Mummert. Sheen became friendly with Mummert and through him met Reynoso-Ulloa (Reynoso) who with his brother operated a car dealership in Tijuana, Mexico.

As Sheen became better acquainted with Reynoso and their "similar interests" became apparent, they began to discuss the smuggling of heroin.[1] About mid-May, 1975, Sheen contacted agents Flego and Zweiger, informed them of Reynoso's involvement in heroin traffic, and asked them if they would be interested "in doing a large amount of heroin in the San Diego and Tijuana areas". The agents indicated their interest and Sheen continued his heroin discussions with Reynoso.[2] Sheen told Reynoso that his father was the head of an organized crime family in Seattle which was seeking a new source of supply for narcotics. Initial negotiations were for one hundred pounds of heroin at a tentative price of $12,000 per pound. About August 3, Sheen called Flego to tell him that things were developing in the case, but that Reynoso and Mummert wanted to see if Sheen's father had the necessary $1.2 million for the deal, and that Sheen and Mummert would be flying to Seattle to view the money.

During the time Sheen was negotiating with Reynoso, he was also negotiating with Mummert, although not in relation to heroin. Mummert had been forced to relocate his car dealership and needed $1,200,000 for the new facility, which he had been unable to obtain. Sheen suggested that a loan might be arranged through his father, who Sheen said was on the board of directors of

---

* Honorable William J. Jameson, Senior United States District Judge for the District of Montana, sitting by designation.

1. Mummert was not involved in these initial heroin discussions.

2. Sheen thereafter maintained close contact with the agents, placing twenty-five to thirty telephone calls to them in the four-week period following the initial phone call and personally going to Seattle on several occasions. On or about June 19 agent Flego began taping most of his conversations with Sheen. These tapes were played at the trial.

a Seattle bank. Sheen told Mummert that the money was "dirty" in that no taxes had been paid on it. Mummert indicated that he could "launder" the money through Reynoso's connections in Mexico. With the view of obtaining a loan by laundering the dirty money, Mummert met Sheen and his "associates" in Seattle on August 7 and viewed the money.[3] After seeing the money, Mummert told Flego that laundering it would be no problem.

Shortly after their return from Seattle, Sheen and Mummert met with Reynoso, when Sheen mentioned the heroin deal in front of Mummert for the first time. Sheen told Mummert that the first priority for the use of the money was to purchase heroin, and that the heroin transaction had to occur before Mummert could get any money for his dealership. On cross-examination Sheen testified that Mummert indicated initial reluctance to becoming involved in the heroin transaction, saying "But I don't really want to be involved with that mess", but that later at the same meeting he agreed to participate.[4] Sheen and Mummert agreed to split ten per cent of the gross profits to be realized on the heroin transaction, which was to be invested in Mummert's dealership. A few days later, around mid-August, Sheen and Mummert were shown a sample of heroin by Reynoso in Tijuana. The following day Reynoso delivered the sample to Sheen in the presence of Mummert at Mummert's dealership.

Direct negotiations between the agents and appellants began on August 26, when Flego called and discussed with Reynoso the price, amounts, and delivery locations for kilogram quantities of heroin. During the call Reynoso admitted making prior heroin sales. In telephone conversations the following day, Flego and Reynoso agreed to meet in San Diego on August 28.

On August 28, Flego met Reynoso in San Diego and discussed with him the purchase of five to ten kilograms of heroin. Reynoso gave Flego another sample of heroin. Reynoso told Flego that he could supply as much heroin as Flego wanted, but delivered "piecemeal" over a period of time. The meeting ended with the understanding that Flego would contact Reynoso in a few days regarding payment and the exact amount of heroin desired. Flego talked with both Reynoso and Mummert by telephone on September 2. Mummert stressed the importance of the "deal" and said it had "to happen now". [Tr. 98–100].

On September 4, Flego and Zweiger flew to San Diego to meet Reynoso, Mummert, and Sheen. Before Reynoso arrived, Zweiger met Mummert and discussed with him the purchase of ten kilograms of heroin for $400,000. Mummert told Zweiger not to worry because he could trust Reynoso, who had been in heroin trafficking for a long time and was interested in doing business with the agents because they would be steady customers.[5] Upon Reynoso's arrival, he told the agents that he could deliver five kilograms of heroin the next day for $200,000. However, problems in the delivery of the heroin developed because, Reynoso said, his most trusted "mules" had gone to Las Vegas to make a delivery.

The following day, after more delays in delivery, the agents returned to Seattle after indicating to Reynoso their dissatisfaction with his operation. During the succeeding four days Sheen was supplied with two more heroin samples by Reynoso, who explained that they would be using a temporary alternate source until their original source returned to the border.

On September 10, Sheen and Carlos Toris, named as a co-defendant, arrived in Seattle to continue negotiations with the agents.

---

3. The record indicates that Mummert went to Seattle to view money he thought was to be for a loan, while Reynoso thought it was to be used for the purchase of heroin.

4. Sheen also testified that he gave Mummert "every opportunity at that point to get out of it [the heroin transaction]." [Tr. 978].

5. The agents had told Reynoso that if the first transaction went smoothly, they wished to purchase fifty pounds of heroin a month.

Toris stated that he could deliver multi-kilogram quantities of heroin and admitted giving Reynoso the two heroin samples furnished to Sheen. Toris agreed to "front" a kilogram of heroin to the agents at Mummert's dealership on September 15.

On September 15, Flego and Zweiger met Sheen and Mummert at Mummert's dealership. About an hour later Rolando Gonzalez arrived with a kilogram of heroin. Mummert asked Flego what he thought of the heroin.[6] Flego responded that it didn't look good since "the mule had a blender in the front seat".[7] Mummert assured Flego that it would not happen again. This meeting broke up with the understanding that the agents would return to Seattle, test the heroin, and then make arrangements for payment. On September 17, Toris called Flego and Zweiger and agreed on a price of $20,000 for the kilogram of heroin—to be paid to Reynoso.

On the afternoon of September 17, agents Flego and Zweiger returned to San Diego and again met with Mummert and Sheen. After renewing their objection to the inferior quality of the heroin, the agents were assured by Mummert that the quality would improve. Mummert explained that an organization called "Omega", consisting of organized crime figures in Mexico dealing in narcotics, was seeking to weed out small-time traffickers in order to maintain control, and that if Toris ever delivered another bad kilogram, the agents would have a chance to see Omega in action. That evening Mummert, Reynoso, Zweiger, and Flego continued to discuss future heroin deliveries. Reynoso assured the agents that Toris was only an interim source and promised them a five-kilogram heroin shipment within the next five days.

On September 19, Sheen phoned Flego that Reynoso and Mummert were ready to deliver one-and-a half kilograms of heroin.

Mummert later delivered a sample and told Flego: "This is a sample of the kilo and a half you're going to get. It is better than what you bought from Toris and this is what our product is like." Shortly thereafter Reynoso arrived, and he, Mummert, Sheen, Zweiger and Flego went to a local lounge to finalize the transaction. While there, Reynoso told the agents that his people had just brought 300 pounds of morphine base from the interior of Mexico to a location outside Tijuana where it would be processed at a portable lab. The meeting ended with the agreement that Zweiger and the money[8] would stay with Mummert at the dealership, while Flego, Sheen, and Reynoso went to Los Angeles to take delivery of the heroin.

During the drive to Los Angeles, Reynoso told Flego that after a few more transactions, he would give Flego a number in Los Angeles to call and as many as five kilos would be provided on a two-day notice. Upon arriving in Los Angeles, Reynoso delivered the heroin to Flego and was arrested.

Zweiger and Mummert waited at the dealership until, subsequent to Reynoso's arrest, agents arrived and arrested Mummert. While waiting, Mummert asked Zweiger if he had seen the sample of heroin which Mummert had delivered to Flego. Upon Zweiger's negative response, Mummert stated: "Well, it's not as good as some that I've seen Alfredo sell, but it's not too bad." [Tr. 1112] Mummert also elaborated on how he had become involved in the transaction. He explained that he knew Sheen had contacts interested in purchasing multi-kilogram quantities of heroin and that he knew Reynoso "had been involved in the business for a long time". Mummert said that he decided that he could finance his new dealership from profits from heroin sales if he put Sheen's customers together

---

**6.** No money was to be paid by the agents for the heroin until they determined whether the heroin was of acceptable quality.

**7.** This indicated to Flego that the mule had skimmed off some of the heroin and cut down the remainder.

**8.** A purchase price of $75,000 had been agreed to, the money to be paid to Mummert.

with Reynoso. Mummert concluded by saying that he had therefore convinced Reynoso to sell heroin to Sheen's people. [Tr. 1113]

Both appellants relied upon entrapment as a defense. Reynoso claimed that he participated in the transaction because of threats by Sheen. Mummert claimed that he was induced to participate in the heroin sales because of the large amount of money Sheen had shown him under the pretext that the money was to be a loan for Mummert's car dealership; that he lacked any predisposition to sell heroin and did so only because, after seeing the money which he needed to save his dealership, he was unable to stop himself. Mummert testified that after becoming involved he continued to participate because of threats Sheen had made against Reynoso's friends and children.

### Contentions on Appeal

Reynoso contends that the court erred in instructing the jury on entrapment and that the conduct of informant Sheen was so outrageous as to deny him due process. Mummert contends that he was entrapped by Sheen, that elaborating instructions on entrapment should have been given, that Sheen gave perjurious testimony, and that Zweiger made severely prejudicial statements in his testimony.

### I. *Entrapment*
#### *Predisposition to Commit Offense*

The Supreme Court has dealt with the defense of entrapment in four major cases, each of which indicates that the focal point of the defense is the predisposition of the defendant, rather than the nature of Government conduct. In the leading case of *Sorrells v. United States,* 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932) the Court held that the defendant, who had sold a half-gallon of whiskey to a prohibition agent in violation of the National Prohibition Act after "repeated and persistent solicitation" by the agent, was entitled to the defense of entrapment as a matter of statutory construction. In reaching its decision, the

Court noted that "[i]t is well settled that the fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution". 287 U.S. at 441, 53 S.Ct. at 212. But while "[a]rtifice and stratagem may be employed to catch those engaged in criminal enterprises", 287 U.S. at 441, 53 S.Ct. at 212, the Government may not "implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute". 287 U.S. at 442, 53 S.Ct. at 212. The controlling question, the Court said, is "whether the defendant is a person otherwise innocent whom the government is seeking to punish for an alleged offense which is the product of the creative activity of its own officials". 287 U.S. at 451, 53 S.Ct. at 216.

*Sherman v. United States,* 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958), involved the sale of narcotics to a Government agent following a number of requests by the agent predicated upon his presumed suffering from a lack of narcotics. The issue was "whether the informer had convinced an otherwise unwilling person to commit a criminal act or whether petitioner was already predisposed to commit the act and exhibited only the natural hesitancy of one acquainted with the narcotics trade". 356 U.S. at 371, 78 S.Ct. at 820. Noting that "a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal", the Court found that the defendant had been entrapped as a matter of law, based on the "undisputed testimony" of the prosecution's own witnesses. 356 U.S. at 373, 78 S.Ct. 819.

In an extensive exposition on the law of entrapment, the Court in *United States v. Russell,* 411 U.S. 423, 429, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973) upheld the principles enunciated in *Sorrells* and *Sherman* and reaffirmed that the crucial element in the defense of entrapment was the defendant's predisposition to commit the crime. The Court stated that "it is only when the Government's deception actually implants the criminal design in the mind of the de-

fendant that the defense of entrapment comes into play." 411 U.S. at 436, 93 S.Ct. at 1645. The most recent statement by the Supreme Court on entrapment came in *Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976). The defendant was convicted on two counts of distributing heroin which he contended had been supplied to him by a Government informant. The Court, in holding that the defendant had not been subjected to police conduct so outrageous that due process would bar conviction, see *United States v. Russell, supra* at 431–432, 93 S.Ct. 1637, reiterated that the defense of entrapment was predicated on the defendant's lack of predisposition. 425 U.S. at 490, 96 S.Ct. 1646.

While it is clear that the essential element of an entrapment defense is lack of predisposition to commit a criminal act, the precise meaning of "predisposition" is not so apparent. We find the guidelines in *Sorrells* and *Sherman.*

In *Sorrells* the defendant was a man of reputed good character in the community. While some Government witnesses testified that he had a reputation as a rum-runner, there was no evidence that he had ever possessed or sold any intoxicating liquor prior to the transaction for which he was convicted. A prohibition agent came to defendant's home posing as a tourist who had been in the same army division as defendant during World War I. A conversation ensued among the agent, defendant and several of defendant's friends about their war experiences, during which the agent asked the defendant if he could get the agent some liquor. The defendant twice refused these requests, stating, as one witness testified, that he "did not fool with liquor", but finally acceded upon the third request by the agent and brought him a half-gallon of whiskey after an interval of "between twenty and thirty minutes". The agent testified that he was "the first and only person among those present at the time who said anything about securing some liquor" and that his purpose was to prosecute the defendant for procuring and

selling it. On these facts the Supreme Court concluded:

"It is clear that the evidence was sufficient to warrant a finding that the act for which defendant was prosecuted was instigated by the prohibition agent, that it was the creature of his purpose, that defendant had no previous disposition to commit it but was an industrious, law-abiding citizen, and that the agent lured defendant, otherwise innocent, to its commission by repeated and persistent solicitation in which he succeeded by taking advantage of the sentiment aroused by reminiscences of their experiences as companions in arms in the World War." 287 U.S. at 441, 53 S.Ct. at 212.

*Sherman* involved a defendant convicted on three counts of selling narcotics to a Government informant whom he had met at a doctor's office where both apparently were being treated for drug addiction. After several meetings and conversations about their mutual problems in overcoming drug addiction, the informant asked the defendant if he knew a good source of narcotics because, the informant stated, he was not responding to treatment. Defendant tried to avoid the issue but finally acquiesced after a number of requests by the informant, predicated on his presumed suffering. Defendant thereafter obtained narcotics several times and shared them with the informant. Each time defendant bore the cost of his share of the drugs plus the expenses in obtaining them. The Supreme Court held that the defendant had been entrapped as a matter of law by the informant's resort to sympathy to induce the defendant to sell narcotics. The Court stated:

"One request was not enough, for Kalchinian [the informant] tells us that additional ones were necessary to overcome, first, petitioner's refusal, then his evasiveness, and then his hesitancy in order to achieve capitulation. Kalchinian not only procured a source of narcotics but apparently also induced petitioner to return to the habit." 356 U.S. at 373, 78 S.Ct. at 821.

Furthermore, the Court found no evidence aside from a record of defendant's past convictions, to support the Government's case: "There is no evidence that petitioner himself was in the trade. When his apartment was searched after arrest, no narcotics were found. There is no significant evidence that petitioner even made a profit on any sale to Kalchinian." 356 U.S. at 375, 78 S.Ct. at 822.

*Sorrells* and *Sherman* reveal a number of factors which must be considered in determining whether the defendant was a person "otherwise innocent" in whom the Government implanted the criminal design. Among these are the character or reputation of the defendant, including any prior criminal record;[9] whether the suggestion of the criminal activity was initially made by the Government;[10] whether the defendant was engaged in the criminal activity for profit; whether the defendant evidenced reluctance to commit the offense, overcome only by repeated Government inducement or persuasion; and the nature of the inducement or persuasion supplied by the Government. While none of the factors alone indicates either the presence or absence of predisposition, the most important factor, as revealed by Supreme Court and other decisions, is whether the defendant evidenced reluctance to engage in criminal activity which was overcome by repeated Government inducement.[11]

### Mummert's Defense

The evidence is sufficient to establish Mummert's predisposition to commit the offenses for which he was convicted, when viewed in a light most favorable to the Government. Cf. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Agent Zweiger testified that in his conversation with Mummert on September 19, Mummert told him that he became involved in the heroin transaction when he realized that he could finance his dealership with profits from heroin sales if he put Sheen's customers together with Reynoso. Mummert also told Zweiger that he was the person who convinced Reynoso to sell heroin to Sheen's people. This testimony was uncontroverted, even by Mummert.

In other conversations with Sheen and the agents, Mummert manifested his knowledge of smuggling heroin across the border and the quality of heroin Reynoso was capable of delivering. On one occasion, Mummert told the agents that if Toris ever again delivered inferior heroin, he would be "wasted". He discussed a previous heroin transaction in which a "mule" who had been "skimming" had been taken care of. While these statements by Mummert do not establish his involvement in previous heroin transactions, they do lead to that inference.[12]

The evidence most damaging to Mummert's entrapment defense, however, is his own testimony. He admitted that he became involved in the transaction to finance his dealership. He did not deny that he had convinced Reynoso to sell the heroin, nor did he testify that he had shown any reluctance or refusal to continue in the heroin

---

**9.** It is not necessary, however, to show that the accused "had previously been convicted of, or had previously committed, acts similar to those for which he was being tried. This argument is specious, inasmuch as one may be predisposed to commit his first crime as much as, if not more than, a chronic offender who, theoretically, should be more fearful of the consequences." *United States v. Martinez,* 488 F.2d 1088, 1089 (9 Cir. 1973).

**10.** However, this fact alone in no way indicates entrapment, since mere solicitation is not enough to show entrapment. See *Lopez v. United States,* 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963); *United States v. DeVore,*

423 F.2d 1069 (4 Cir. 1970), *cert. denied,* 402 U.S. 950, 91 S.Ct. 1604, 29 L.Ed.2d 119 (1971).

**11.** We have found no case in which the defense of entrapment (as opposed to cases dealing with due process principles) was successful where the defendant had not indicated reluctance to engage in illegal activity.

**12.** Mummert also told agents Flego and Zweiger that he was "well-connected" with organized crime in the El Cajon area. Pointing to several individuals, Mummert said: "They're your biggest competition in heroin trafficking in San Diego."

scheme.[13] He testified that at one point, when Reynoso was reluctant to proceed with the heroin sale, he talked Reynoso "back into doing it again".[14] Finally, Mummert testified that he was unconcerned about his involvement with heroin: ". . . They had heroin coming in before they met me. And they're going to get it someplace, so why should I be concerned." [Tr. 1727][15]

A jury could reasonably conclude that Mummert had the necessary predisposition to sell heroin and had not been entrapped. The testimony established that Mummert showed little, if any, real resistance to participation in the heroin transaction when it was revealed to him,[16] nor was he concerned about the illegal nature of that activity. In fact, rather than being a reluctant participant in the transaction, the evidence indicated that Mummert at times was the moving force behind it. Mummert convinced Reynoso to sell the heroin, persuaded Reynoso not to back out, and even made physical delivery of heroin samples. On several occasions Mummert urged the agents not to blow the "sweet deal". These actions and statements are not indicative of a person "otherwise innocent", but instead reveal an "unwary criminal" anxious to successfully conclude his criminal enterprise.

■ The nature of the inducement confirms this conclusion. Mummert was seeking a large sum of money for his dealership. The fact that he was willing to "launder" the untaxed money before he was told of the heroin scheme,[17] together with the other

13. "Q At that point you were in a little deeper; isn't that correct?
"A Oh, yes.
"Q Did you tell them, 'Just stop, I want to walk away from this'?
"A Well, I was told by Michael Sheen that the million two hundred thousand was in the bank with the 400,000.
"Q So you were thinking about your dealership.
"A You bet.
"Q And you didn't stop the transaction at that point.
"A No, sir." [Tr. 1738]

14. "Q And then the transaction continued to go forward; isn't that correct?
"A Yes, sir.
"Q And the 5th there was another meeting, right?
"A Yes, sir.
"Q Did you continue to discuss how important this heroin transaction was? Isn't that correct?
"A Absolutely. That was the only way I was going to get my dealership.
"Q The wraps were off it insofar as you were concerned, weren't they? I mean, you knew exactly what was involved; isn't that correct?
"A Yes. And I think that on the 5th was the day that I had to go down and talk Alfredo back into doing it again." [Tr. 1739]

15. Mummert testified on this point several times:
"Q You weren't troubled a bit about the idea of heroin being connected with this transaction?
"A It never entered my mind, because they were—like I said before, they were getting it before they met me.
"Q At that point you had no conscience problems; isn't that correct?

"A Well, like I repeat again. It wasn't a case of conscience, it was a case that they had the money before they met me, they were in the heroin business before they met me, I wasn't aware of it, but—this is the way that the thing was sprung on me." [Tr. 1740]

"Q Was it your testimony that the only reason you got involved was just to develop your dealership?
"A Absolutely.
"Q And long before Richard Mummert arrived, there was heroin, and there'll be after you leave; is that correct?
"A I'm sure of that.
"Q And you just simply weren't responsible for the heroin; is that correct?
"A Correct." [Tr. 1752]

16. The only evidence of reluctance was Sheen's testimony that when Mummert first learned that the money for his dealership was to come from heroin sales he said: "But I don't really want to be involved with that mess." This statement was not even confirmed by Mummert. In any event, he showed no further reluctance and became an active participant in the conspiracy.

17. "Q Yet you were concerned about acquiring this untaxed money to build the dealership.
"A I wasn't concerned about it. They had it a long time before they met me.
"Q So long as money is money, it has no odor, as the Swiss say; is that correct?
"A No, I was aware that the taxes hadn't been paid on the money.
"Q But that didn't affect you, of course.
"A No, sir.
"Q As far as you were concerned, it was money, and money was to be used.
"A Yes, sir. And it wasn't my responsibility to pay taxes." [Tr. 1726–1727]

evidence, leads to the inference that Mummert was willing to do almost anything to obtain the money. The defense of entrapment, while protecting the innocent from Government creation of crime, is unavailable to a defendant who, motivated by greed and unconcerned about breaking the law, readily accepts a propitious opportunity to commit an offense. Although the Government's use of the $1.2 million does indicate a degree of inducement to the commission of the offense, we find sufficient evidence of Mummert's predisposition to preclude entrapment as a matter of law.

■ Mummert additionally argues that because Sheen was working on a contingent fee basis,[18] he was entrapped as a matter of law. He relies upon *Williamson v. United States,* 311 F.2d 441 (5 Cir. 1962), *cert. denied,* 381 U.S. 950, 85 S.Ct. 1803, 14 L.Ed.2d 724 (1965) in which the Fifth Circuit reversed the convictions of two defendants for possession of whiskey in unstamped containers because the informant with whom they had dealt was being paid on a contingent fee basis. *Williamson* is factually distinguishable,[19] and we decline, in any case, to follow its rationale in light of *Russell* and *Hampton,* which indicate that predisposition of the defendant, rather than

the conduct of the Government, is to be the focal point of an entrapment defense. Having found Mummert to be predisposed, there can be no entrapment. See *United States v. Russell, supra,* at 436, 93 S.Ct. 1637.

Furthermore, "[t]o sustain [appellant's] contention here would run directly contrary to [the] statement in *Russell* that the defense of entrapment is not intended 'to give the federal judiciary a "chancellor's foot" veto over law enforcement practices of which it did not approve.' " *Hampton v. United States, supra* at 490, 96 S.Ct. at 1649 citing *United States v. Russell, supra* at 435, 93 S.Ct. 1637.[20] We conclude that Mummert was not entrapped as a matter of law merely because the informant was to be paid on a contingent fee basis.

## II. *Due Process*

Reynoso contends that due process requires the reversal of his conviction because of profane threats made to him by Sheen.[21] The threats were made on September 6, 1975, when Reynoso allegedly was having doubts about continuing the transaction.[22] Appellant relies upon dictum in *Russell* where the Court noted that it might "some day be presented with a situation in which

18. Sheen's fee was to depend on the size of the transaction and number of participants. He was to be paid a specific amount for each pound of heroin seized and for each "body" involved. At the time of appellants' arrest, that amount had not yet been determined.

19. In *Williamson,* the defendant was a "specified suspect" and the informant was employed to obtain evidence against him. Here Sheen learned of Reynoso's involvement in the heroin traffic, reported to the DEA agents, and agreed to work on the case. As in the past he would be paid a contingent fee. We are not unmindful that few would engage in a dangerous enterprise of this nature without assurance of substantial remuneration.

20. Mr. Justice Powell said in a footnote to his concurrence in *Hampton:* ". . . One cannot easily exaggerate the problems confronted by law enforcement authorities in dealing effectively with an expanding narcotics traffic, [citations omitted] which is one of the major contributing causes of escalating crime in our cities. [citations omitted] Enforcement officials

therefore must be allowed flexibility adequate to counter effectively such criminal activity." 425 U.S. at 495–496, n. 7, 96 S.Ct. at 1652.

21. The threat, in Sheen's own words, was: ". . . I told Alfredo, I said, you know, you mother fucker, they are making it, I'm swinging right now. I mean, you know, these people are pissed. My old man ain't too happy with this whole program and I told him, I said if I'm gonna get my ass in this much shit, I'm gonna do you cocksuckin fuckin Mexican friends, and he said okay, I don't blame you, so he said I'll put you right into it. So he did." [R.T. 320]
Testimony showed that the phrase "do you" means to kill someone. Reynoso thus contends that Sheen threatened to kill his friends unless he carried out the heroin sale.

22. This argument is raised by Reynoso with respect to all counts with which he was charged, except *Count II (delivery of one gram of heroin on August 28, 1975)* which occurred before the threat.

the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from involving judicial processes to obtain a conviction . . . ." 411 U.S. at 431–432, 93 S.Ct. at 1643.

Clearly, Reynoso cannot rely on the defense of entrapment since he does not challenge the implicit finding of his predisposition, of which there is overwhelming evidence. Neither do we find Sheen's conduct, although by no means commendable, to have been so outrageous that principles of due process require reversal of his conviction. The threat must be viewed in the context of the vulgarity and "puffing" engaged in by all participants in the transaction. It is an isolated incident in over two months of negotiations among Sheen, the agents, and appellants during which numerous false claims and veiled threats were made.[23] This court may judicially notice the fact that trafficking in drugs is a sordid business, and often involves persons of the lowest caliber. When viewed in this context, Sheen's threat fails to rise to the level of conduct violative of "fundamental fairness, shocking to the universal sense of justice". *Kinsella v. United States ex rel. Singleton,* 361 U.S. 234, 246, 80 S.Ct. 297, 304, 4 L.Ed.2d 268 (1960).

### III. *Instructions*

The court instructed the jury that the Government bore the burden of proving beyond a reasonable doubt that appellants were not entrapped and defined entrapment as follows:

"Where an otherwise innocent person, with no previous intent or purpose to violate the narcotics laws, is induced or persuaded by law enforcement officers or their agents to commit a crime, he is the victim of entrapment and the law, as a matter of policy, forbids his conviction in such a case.

"On the other hand, where a person already has the predisposition, that is, the readiness and willingness to break the narcotics laws, the mere fact that Government agents provided what appears to be a favorable opportunity, is not entrapment.

. . . . .

"If, then, the jury should find beyond a reasonable doubt from the evidence in this case that before anything at all occurred respecting the alleged offenses involved in this case, the defendant was ready and willing to commit the crimes as charged in the Indictment, whenever opportunity was afforded, and the Government officers or their agents did no more than offer the opportunity, then the jury should find that the defendant was not a victim of entrapment.

"On the other hand, if the evidence in the case should leave you with a reasonable doubt whether the defendant had the previous intent or purpose to commit any offense of the character here charged, and did so only because he was induced or persuaded by some officer or agent of the Government, then it is your duty to acquit him.

"The terms 'inducement or persuasion,' in the law of entrapment, may include the promise of money or other economic benefit.

"Law enforcement officers are entitled to infiltrate groups of persons whom they know or suspect to be involved in criminal activity. There is nothing unlawful or improper in doing that. The law, however, does not permit Government agents to originate or implant the criminal design in a defendant's mind."

Appellants argue that the court should have given their proposed elaborating instructions on entrapment and that refusal to do so was reversible error. Reynoso's proposed instructions stated:

"If looking to the totality of the circumstances of this case, you find that the conduct of government agents or those acting on their behalf was so outrageous

**23.** The jury had a full opportunity to consider the statement in view of all the surrounding circumstances. On cross-examination Sheen was interrogated at length with respect to this statement, and Reynoso's counsel made frequent reference to it in his closing argument.

as to be fundamentally unfair and shocking to the universal sense of justice, you must acquit the defendants and need not consider the question of predisposition." This instruction does not state the law of entrapment as it presently exists and was properly refused. See *Hampton v. United States, supra.*

 Mummert submitted elaborating instructions on (1) economic inducement, (2) "ready and willing" predisposition, (3) caution against making a moral judgment, (4) totality of the circumstances and (5) a "but for" instruction, all of which were properly refused. The instructions offered by Mummert were either repetitious or gave inordinate emphasis to the inducement element of entrapment. The instructions given by the court properly instructed the jury on the elements of entrapment necessary to decide the case. *Hampton v. United States, supra; United States v. Russell, supra; United States v. Griffin,* 434 F.2d 978, 981–982 (9 Cir. 1970),[24] *cert. denied,* 402 U.S. 995, 91 S.Ct. 2170, 29 L.Ed.2d 160, *reh. denied,* 404 U.S. 877, 92 S.Ct. 27, 30 L.Ed.2d 124 (1971).

### IV. *Perjury*

[11] Sheen testified that prior to the transaction involved in this case, he made trips to Charlotte, North Carolina and Daytona, Florida with Mummert to attend stock car races, and that during these trips drugs and money, in which Reynoso was involved, were exchanged. The trip to Charlotte was admitted, but Sheen's testimony with respect to the drug transactions was denied by Mummert and several other witnesses. Sheen testified that Reynoso also made the trip to Daytona. Mummert and Reynoso, supported by the testimony of other witnesses, denied that this trip was ever made. Mummert now contends that Sheen's testimony was perjury which was severely prejudicial.

"Before a sentence may be vacated on the ground of perjured testimony, the movant must show that the testimony was perjured and that the prosecuting officials knew at the time such testimony was used that it was perjured." *Marcella v. United States,* 344 F.2d 876, 880 (9 Cir. 1965), *cert. denied,* 382 U.S. 1016, 86 S.Ct. 630, 15 L.Ed.2d 531 (1966). Although the record indicates that Sheen's testimony was perjured, there is no evidence that the Government knowingly used the false testimony.

Moreover, this is not a case where the defendants learned subsequent to trial that perjured testimony had been offered by the prosecution. Here appellants' counsel knew well in advance of the trial what Sheen had told the agents and what his testimony would be with respect to the alleged trips. Appellants were fully prepared to rebut Sheen's testimony and thereby impeach his credibility. The alleged perjury was fully explored at the trial.

Under the circumstances we find no prejudice. It concerned events which occurred before any participation by Mummert in the heroin transaction. Nor was Mummert involved in the apparently fictitional drug transactions which were the subject of the false testimony. Sheen's testimony was, if anything, helpful to Mummert, since it tended to discredit Sheen and to bolster Mummert's entrapment defense. We find no reversible error.

### V. *Prejudicial Statement*

 Finally, Mummert contends that a statement made by agent Zweiger during direct examination was so prejudicial as to require a mistrial. Zweiger testified that Mummert, in one of their conversations, stated that he was "well-connected in the El Cajon area and in the Los Angeles area with organized crime figures". The court, prior to this testimony, had instructed Government counsel to go over prospective testimony with its witnesses and avoid areas of possible prejudice. Government counsel stated that he had complied with the court's order, but that Zweiger's statement came as a surprise.

Rather than objecting to the testimony and requesting a cautionary instruction, counsel for Mummert waited and later moved for a mistrial. In denying the mo-

---

**24.** The court's instruction is nearly verbatim that approved in *Griffin.*

tion, the court said: ". . . it is material that tends to be prejudicial. On the other hand, I think in the context of what is now before the Court, the statement is probative. I don't think it was planned to come in, it did come in, and I deny the motion for mistrial".

Mummert contends that this evidence referred to prior conduct of Mummert which inadmissibly tended to show criminal disposition or character. See *Parker v. United States,* 400 F.2d 248, 252 (9 Cir. 1968), *cert. denied,* 393 U.S. 1097, 89 S.Ct. 892, 21 L.Ed.2d 789 (1969). This argument overlooks the fact that Mummert was relying on the defense of entrapment, which exposes a defendant to a "searching inquiry into his own conduct and predisposition as bearing upon that issue. If in consequence he [the defendant] suffers a disadvantage, he has brought it upon himself by reason of the nature of the defense". *Sorrells v. United States, supra,* 287 U.S. at 451–452, 53 S.Ct. at 216. Zweiger's testimony bore on the issue of Mummert's predisposition. Any prejudice inherent in the statement was outweighed by its relevance to that issue.

In any case, Zweiger's statement was not so prejudicial as to require a mistrial. At the time of the statement, there had been testimony that Mummert had told the agents about the functioning of Omega, a group of Mexican organized crime figures dealing in narcotics. The evidence also revealed that on one occasion Mummert, in the presence of Flego and Zweiger, had pointed to several San Diego organized crime figures and said: "They're your biggest competition in heroin trafficking in San Diego." At the time of Zweiger's testimony there was thus already evidence indicating Mummert's familiarity with organized crime. Furthermore, the testimony came as a surprise, and defense counsel failed to immediately object or to request cautionary instructions. In these circumstances we find that the testimony was not highly prejudicial. The court's refusal to declare a mistrial was a proper exercise of

its discretion. See *United States v. Bergman,* 354 F.2d 931, 935 (2 Cir. 1966).

### Conclusion

We conclude that (1) both appellants were predisposed to the commission of the offenses for which they were convicted and were not entrapped; (2) the conduct of informant Sheen was not so outrageous as to deny Reynoso due process of law; (3) the court properly instructed the jury on the law of entrapment; and (4) neither Sheen's allegedly perjurious testimony, nor Zweiger's voluntary testimony was so prejudicial as to require reversal. Accordingly, appellants' convictions are affirmed.