**UNITED STATES of America, Plaintiff,**

**v.**

**Clemente VALDOVINOIS–VALDOVINOIS, Defendant.**

**No. CR–83–0711 RFP.**

United States District Court, N.D. California.

Feb. 15, 1984.

Larry Gallagher, Asst. U.S. Atty., San Francisco, Cal., for plaintiff.

Carlo Andreani, San Francisco, Cal., for defendant.

## MEMORANDUM AND ORDER

PECKHAM, Chief Judge.

The motion before the court raises two distinct but related questions: (1) Did the government engage in "outrageous conduct" by advising Mexican citizens— through the use of an undercover telephone operation known as a "cold line"— that it was appropriate to enter the United States without immigration papers, for the sole purpose of tracking these Mexican citizens in hopes of arresting their transporters; and (2) if this conduct was "outrageous", were the defendant's due process rights violated when his arrest for transporting illegal aliens occurred solely as a result of information obtained through the "outrageous" conduct.

The court concludes that the government's conduct was indeed outrageous in advising Mexican citizens to enter the United States illegally. The court also concludes that the government is not entitled to benefit in any way from such conduct. Thus, the defendant's arrest, which was a direct result of this impermissible conduct, is derivatively barred. Consequently, the indictment in this case must be dismissed.

## I. FACTS

The defendant, Clemente Valdovinos-Valdovinos ("Valdovinos") has been indicted on three counts: (1) transporting illegal aliens, 8 U.S.C. § 1324(a)(2); aiding and abetting, 18 U.S.C. § 2; and conspiracy, 18 U.S.C. § 371. He moves to dismiss the indictment against him on the sole ground that the government's conduct in this case was so

outrageous that his constitutional right to due process was violated.

The government conduct at issue commenced long before there was any direct government contact with Valdovinos. The direct government activity in this case began at approximately 8:00 AM on October 31, 1983 when the San Francisco District Anti-Smuggling Office of the Immigration and Naturalization Service ("INS") received a collect telephone call from Tijuana, Mexico. The caller identified himself to Agent Steven Abla as "Elmor Rodriquez."[1]

Rodriquez did not call the normal or publicly published telephone number of the San Francisco INS office. Instead, the INS received his call on what is known as a "cold line", an undercover telephone operation set up and staffed by INS agents. These undercover INS agents pose as American employers seeking to hire illegal aliens. The purpose of this cold line, according to testimony offered by Agent Abla, is to make contact with persons who may want to enter the United States illegally. After this initial contact is made, the undercover INS agents offer to reimburse the smuggling expenses incurred by the aliens and to supply them with employment. Once the individuals enter the United States and rendevous with the undercover agents to claim their expenses and jobs, the agents arrest those in charge of transporting the aliens and the aliens themselves are deported.

There is apparently little dispute over the general operations of the cold·line itself. Agent Abla conceded that there are no written guidelines or procedures established by the INS that structure the use of the cold line. No tape recordings of the incoming calls are made; no transcripts of the conversations are ever compiled. Apparently, the INS does not even keep a formal log of all the calls it receives. Abla also testified that the INS has no coherent policy as to when or how it disseminates the telephone number of the cold line. Abla's testimony demonstrated that the use of this cold line has simply "evolved" over recent years without any formal policy guidance.

The substance of the October 31 call between Rodriquez and Abla is disputed, although the court is able to make factual findings as to what transpired. Abla's recollection of the call is that Rodriquez first stated that he planned to enter the United States illegally and only then were there any discussions about the reimbursement of smuggling expenses. His testimony, although internally contradictory in places, essentially maintained that he agreed to pay the fees only *after* Rodriquez expressly stated his intent to enter the United States illegally.

Rodriquez recalled the conversation differently.[2] He testified that he told Abla (whom he believed to be an American employer) that he wanted to come to the United States, but that he and an unnamed accomplice had no immigration papers.[3] After telling Abla that he had no immigration papers, Rodriquez stated that he asked Abla whether he could enter the United States without them. According to Rodriquez, Abla assured him that the lack of papers was not a problem. Rodriquez also testified that had Abla not made this statement, neither he nor his compatriot would have entered the United States illegally.

---

**1.** "Elmor Rodriquez" was later discovered to be a Mexican citizen named Pedro Xochimitl-Chichia. For the purposes of this order, however, the court will continue to refer to him as Rodriquez because that was the name he used throughout the activities in question here.

**2.** Rodriquez never testified personally at the evidentiary hearing held by the court on January 9, 1984. The court did, however, carefully review a deposition conducted on November 23, 1983 before Rodriquez was deported back to Mexico.

It is this deposition transcript (along with depositions of other illegal aliens involved in this enterprise) that the court relies upon in making its factual findings.

The court also wishes to emphasize that it did have the benefit of personally assessing the credibility of Agent Abla.

**3.** According to the deposition testimony reviewed by the court, this unnamed accomplice was Bernardo Escudero-Jiminez.

Rodriquez also testified that after Abla affirmed that the lack of immigration papers posed no problem, Abla stated that he would be willing to pay $700 in smuggling fees once Rodriquez and his friend reached San Francisco. At this point in the conversation, Abla told Rodriquez to contact him at the cold line telephone number after entering the United States.

On November 2, 1983, at approximately 8:00 in the morning, an individual claiming to be calling on behalf of Rodriquez placed a collect call to the cold line number. This call originated in Los Angeles. The caller told Abla that he had smuggled two individuals into the United States and would transport them to San Francisco for $700. Abla apparently agreed to this arrangement and instructed the caller to contact him again at the cold line upon arrival in San Francisco.

Later that same morning, Abla received another call from Rodriquez. Rodriquez stated that there were now three illegal aliens and inquired whether Abla would pay an additional $350 smuggling fee for the third individual.[4] Abla told Rodriquez to tell the man who made the second call— the man acting as the transporter—to telephone the cold line himself.

Approximately thirty minutes later, this individual called the cold line. Abla and the caller discussed the third alien and Abla agreed to pay the additional smuggling fee. Further plans were made regarding delivery in San Francisco.

The next morning, November 3, the final call was received on the cold line. The caller informed Abla that he had arrived in San Francisco with the aliens. Abla arranged to meet the caller in Mission Dolores Park in San Francisco. Accompanied by other INS agents, Abla went to Mission Dolores Park where he made contact with the aliens (now four in number) and the

two men transporting them. After a brief conversation during which Abla offered, and the two transporters accepted, $350 as partial payment for the smuggling expenses, the INS agents arrested the defendant and another man (Jorge Nunez-Ceja) for transporting illegal aliens. The INS also took the four illegal aliens being transported by Valdovinos and Nunez-Ceja into custody.

## II. OUTRAGEOUS GOVERNMENT CONDUCT

The Supreme Court first raised the concept of police conduct so outrageous as to void any conviction derived from it in *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973):

> [W]e may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction. . . .

*Id.* at 431–32, 93 S.Ct. at 1642–43.

Although a plurality of the Supreme Court expressed some disapproval of this concept in *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), the Ninth Circuit has explicitly held that the concept still survives. *United States v. Prairie*, 572 F.2d 1316, 1319 n. 2 (9th Cir.1978). *See also United States v. Ramirez*, 710 F.2d 535, 539 (9th Cir.1983); *United States v. Lomas*, 706 F.2d 886, 891 (9th Cir.1983). Thus, for the purposes of this motion, the court must assume that no government prosecution can be maintained if it is established that the government engaged in outrageous conduct.

A motion to dismiss based on outrageous government conduct is not the same as an entrapment defense.[5] Although fre-

---

**4.** The deposition testimony suggests that this third alien was Ramiro Rodriquez-Garay.

**5.** The defendant concedes that there is no entrapment issue *per se* in this case because there was never any direct contact between the defendant and the government prior to the arrest.

As the Ninth Circuit has ruled that there is no "derivative entrapment," this court only considers the outrageous government conduct question. *See United States v. Lomas*, 706 F.2d 886, 891 (9th Cir.1983); *United States v. Shapiro*, 669 F.2d 593, 597–98 (9th Cir.1982); *United States v. McClain*, 531 F.2d 431, 437–38 (9th Cir.), *cert.*

quently classified as "close relatives", they do differ in important ways. *United States v. Wylie,* 625 F.2d 1371, 1377 (9th Cir.1980), *cert. denied,* 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981). Outrageous government conduct is a question of law. As such, it is an issue reserved for decision by the court, while entrapment must be presented to the jury. *Id.* at 1378. *See also United States v. McQuin,* 612 F.2d 1193, 1196 (9th Cir.), *cert. denied,* 445 U.S. 955, 100 S.Ct. 1608, 63 L.Ed.2d 791 (1980); *United States v. Prairie,* 572 F.2d at 1319; *United States v. Gonzales,* 539 F.2d 1238, 1240 n. 1 (9th Cir.1976).[6]

[redacted] Furthermore, unlike entrapment, indicia of a defendant's predisposition are irrelevant to the issue of outrageous government conduct. As the Ninth Circuit concluded in *United States v. Gonzales-Benitez,* 537 F.2d 1051, 1055 (9th Cir.), *cert. denied,* 429 U.S. 923, 97 S.Ct. 323, 50 L.Ed.2d 291 (1976), "[*U.S. v.*] *Hampton* [425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113] left open the possibility that the conviction of a predisposed defendant may be reversed when the government's involvement in the criminal scheme reaches such an outrageous level as to violate due process." As the Ninth Circuit recently stated, "[a] defendant barred from claiming entrapment may still invoke the outrageous government conduct defense if he was subjected to police conduct repugnant to the American system of criminal justice." *United States v. Lomas,* 706 F.2d at 891. Thus, an analysis of outrageous government conduct focuses solely on the behavior of the government, not on the activities of the defendant. *See United States v. Bagnariol,* 665 F.2d 877, 882 (9th Cir.1981), *cert. denied,* 456 U.S. 962, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982); *United States v. Prairie,* 572 F.2d at 1319.

[redacted] This court is well aware that the issue of outrageous government conduct is one frequently raised, but with infrequent success, by criminal defendants. It is true that in the ten years since *Russell* the Supreme Court has reversed no convictions on these grounds. Similarly, the federal appellate courts have only relied upon this concept rarely. *See, e.g., United States v. Twigg,* 588 F.2d 373 (3d Cir.1978); *Greene v. United States,* 454 F.2d 783 (9th Cir. 1971) (pre-dating *Russell*). The Ninth Circuit has even acknowledged that "the due process channel which *Russell* kept open is a most narrow one." *United States v. Ryan,* 548 F.2d 782, 789 (9th Cir.1976), *cert. denied,* 430 U.S. 965, 97 S.Ct. 1644, 52 L.Ed.2d 356 (1977). *See also United States v. Bagnariol,* 665 F.2d at 882; *United States v. Smith,* 538 F.2d 1359, 1361 (9th Cir.1976).

But this court cannot conclude that the infrequent application of the outrageous government conduct defense has rendered the concept a nullity. Just last year, the Ninth Circuit emphasized that there is a threshold of improper behavior beyond which law enforcement officials cannot go without violating due process. *United States v. Ramirez,* 710 F.2d 535 (9th Cir. 1983). In *Ramirez,* the court noted that due process is violated when there is "the generation by police of new crimes merely for the sake of pressing criminal charges against the defendant." *Id.* at 540. The *Ramirez* court held that the facts before it did not suggest such unconstitutional police behavior. But the court did suggest that a lower threshold might be appropriate for protecting the due process rights of criminal defendants: "we do not preclude the possibility that police involvement in crime that falls short of *sharing in the creative* act might violate the due process clause." *Id.* (emphasis supplied).

This court need not inquire as to what the Ninth Circuit intended in *Ramirez* when it referred to police involvement that falls short of sharing in the creative act.

*denied,* 429 U.S. 835, 97 S.Ct. 102, 50 L.Ed.2d 101 (1976).

6. As a question of law, this question is properly raised by a pretrial motion to dismiss the indictment under Fed.R.Crim.P. 12(b). *United States v. Nunez-Rios,* 622 F.2d 1093, 1098 (2d Cir.1980); *United States v. Batres-Santolino,* 521 F.Supp. 744, 745 (N.D.Cal.1981).

The activities of the INS here did *not* fall short of the creative act; the INS was directly enmeshed in the creation of crime by advising Mexican citizens that it was acceptable to cross the United States border illegally. Particularly in light of the transnational implications of this operation, this court concludes that these activities fall precisely within the sphere of police behavior proscribed by the *Ramirez* court.

It is important to delineate precisely what this court finds today—and what it does not. Abla's actions (and the entire management of the cold line) are not constitutionally infirm simply because they involved an undercover strategem. The law is well settled that undercover operations are a permissible and frequently necessary police tactic. *See Sorrells v. United States*, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932); *United States v. Lomas*, 706 F.2d at 890; *United States v. McQuin*, 612 F.2d at 1195–96; *United States v. Gonzales-Benitez*, 537 F.2d at 1055.[7] But as the Ninth Circuit noted in *McQuin*, "there are limits to what either an informant or an undercover agent may do, and we have recognized this." 612 F.2d at 1196.

This court finds that the INS transgressed acceptable limits by setting up an undercover cold line, disseminating that telephone number in Mexico, and then using the operation to advise Mexican nationals still within Mexico that it was appropriate to violate United States law. Notwithstanding any laudable intent on behalf of the INS to infiltrate and/or monitor the smuggling of illegal aliens into the United States, this court concludes that this type of undercover operation places law enforcement agents squarely in the middle of the "creative act" described by *Ramirez*.

An undercover operation such as this—which widely disseminates its undercover telephone number in an apparently unregulated manner, accepts collect phone calls from Mexican citizens still within Mexico, and then advises them it is permissible to enter the United States without proper immigration papers—leads by definition to "the generation by police of new crimes merely for the sake of pressing criminal charges." *United States v. Ramirez*, 710 F.2d at 540. This is not the infiltration of crime; it is its creation. *See United States v. Batres-Santolino*, 521 F.Supp. 744, 752 (N.D.Cal.1981). As such, it violates the due process principles of "fundamental fairness" and shocks "the universal sense of justice." *United States v. Russell*, 411 U.S. at 432, 93 S.Ct. at 1643, *quoting from Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 246, 80 S.Ct. 297, 303, 4 L.Ed.2d 268 (1960).

Unless the Supreme Court's decision in *Russell* is to be denuded of all meaning, then there must be some level at which the government's behavior becomes outrageous. The court concludes that the manner in which the INS operated its cold line rises to that level.

## III. VALIDITY OF ARREST

■ Given that the establishment and operation of the INS's cold line has been

---

**7.** This court is aware that convictions have occasionally been sustained where arguably outrageous government conduct occurred during the course of a long-term undercover operation. In *United States v. Reynoso-Ulloa*, 548 F.2d 1329 (9th Cir.1977), *cert. denied*, 436 U.S. 926, 98 S.Ct. 2820, 56 L.Ed.2d 769 (1978), the court upheld a conviction notwithstanding an undercover agent's use of threats of physical violence to prevent the defendant from backing out of a continuing criminal enterprise. The *Reynoso-Ulloa* court reasoned that such threats, coming after months of negotiations in which countless false claims and veiled threats were made by various people involved in the drug transaction, "must be viewed in the context of the vulgarity and 'puffing' engaged in by all participants." *Id.* at 1339.

Thus, the facts of *Reynoso-Ulloa* are distinguishable from those of the instant action. The "by no means commendable" conduct of the undercover agents in *Reynoso-Ulloa, id.*, did not come at the inception of the criminal activity. Rather, it came after months of planning and, within the totality of the circumstances present in the case, the court did not find it outrageous.

Unlike the instant case, the *Reynoso-Ulloa* court could not conclude that the government conduct involved the "creative act" proscribed by *Ramirez*. On at least this ground, if not on others, *Reynoso-Ulloa* is inapposite.

found by this court to constitute outrageous government conduct, the court must also consider whether the government actually violated the due process rights of the defendant Valdovinos. The government correctly notes that Valdovinos never had any direct contact with the INS cold line, nor did he apparently have any direct contact with the INS until the moment of his arrest in Mission Dolores Park. From this, the government argues that Valdovinos' due process rights were not violated.

The government's argument lacks force. Were it not for the knowledge garnered through the cold line operation itself, no INS agents would have been present at the scene of the arrest. All of the knowledge that the government had about Valdovinos—indeed all of the evidence that could be presented against him at trial—was the fruit of an impermissible government activity. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Silverthorne v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). The government simply cannot be permitted to benefit from such constitutionally tainted knowledge.

To hold otherwise would permit the government to engage in outrageous conduct barred under the constitution, and still reap the benefits by pursuing a prosecution. If the outrageous government conduct defense is to retain any vitality, it must be construed in a manner that proscribes the government from enjoying any such benefit. Once a court finds that outrageous government conduct has occurred, it must bar the government from continuing to seek a prosecution based on that conduct.[8]

In an effort to salvage its case against the defendant, the government maintains that the prosecution can still stand on one final ground. Alleging that there was at least one alien seized by the INS at the scene in Mission Dolores Park who did not enter the United States as a consequence of any government misconduct, the government argues that a case can be made against the defendant for transporting that alien. It is true, according to the evidence received by the court, that there was at least one illegal alien taken into custody who did not enter the United States because of the operations of the INS cold line. Miguel Angel Velasquez-Mejia testified that his illegal entry into the United States occurred independently of the other aliens seized in Mission Dolores Park and he claimed to have no knowledge of the INS cold line.

But the government's contention that the presence of Velasquez-Mejia at the scene of the arrest somehow absolves the INS of its unconstitutional behavior is an argument that can best be described as intellectually sterile. The mere fortuity that Velasequez-Mejia joined the caravan at some point after its commencement in no way excuses the initial improper government behavior. It is the *knowledge* derived from its outrageous conduct that provided the govern-

---

8. This court acknowledges that in certain areas of the law, particularly in the Fourth Amendment realm, a court may not exclude evidence (much less a prosecution) unless it finds "that an unlawful search or seizure violated the defendant's own constitutional rights." *United States v. Payner,* 447 U.S. 727, 731, 100 S.Ct. 2439, 2444, 65 L.Ed.2d 468 (1980). *See also Rakas v. Illinois,* 439 U.S. 128, 138, 99 S.Ct. 421, 427, 58 L.Ed.2d 387 (1978). These Fourth Amendment cases suggest that unless a defendant's own 'search and seizure' rights are violated, he has no standing to protest the violation of another's rights.

These cases do not control the instant situation. First of all, this is not a Fourth Amendment case. This court is aware of no case in which the *Payner* approach has been extended to the Fifth Amendment rights at issue here. Second, and perhaps more importantly, the severe limitation on the use of the outrageous government conduct defense means that the number of prosecutions that the government will be directed to forego will be exceedingly small. Unlike the traditional concerns about the exclusionary rule's "costly toll upon the ability of courts to ascertain the truth in a criminal case," *United States v. Payner,* 447 U.S. at 734, 100 S.Ct. at 2445, the cost will not be unacceptably high here. In weighing the infrequency of the successful use of this defense against its relatively severe consequences in terms of excluding evidence and prosecutions, this court concludes that the internal logic of *Russell* compels the court's conclusion today.

ment with all of its evidence against Valdovinos. That knowledge (and the derivative evidence) was the benefit the government secured from its operation; it is that benefit which the government must be denied. Velasquez-Mejia's presence in Mission Dolores Park is simply irrelevant to the government conduct at issue.

The court does not reach this conclusion simply because the arrest of Valdovinos was illegal. An illegal arrest, without more, can never be the basis for dismissing an indictment. *United States v. Crews,* 445 U.S. 463, 474, 100 S.Ct. 1244, 1251, 63 L.Ed.2d 537 (1980); *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); *Frisbie v. Collins,* 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952). But when the government attempts to capitalize on the knowledge it obtained through a scheme of outrageous conduct, then any indictments flowing from that conduct must fall. That is the clear implication of *Russell.*

██ The knowledge that the government obtained—starting with the initial October 31 telephone call while Rodriquez was still in Mexico in which he was advised that it was appropriate to violate U.S. law, followed by a series of derivative calls which culminated in a telephone call advising the INS that the illegal aliens had arrived in San Francisco—allowed the government to make its arrest. Without the outrageous government conduct, no arrest or indictment would have been possible. To allow this indictment to stand in light of all that has transpired would only validate the outrageous conduct of the government.

The court holds that the government cannot benefit from its outrageous conduct in any way. As such, the indictment against the defendant must be dismissed.

IT IS SO ORDERED.