**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Kevin Darrell McQUIN, Eddie Jerome Johnson, Defendants-Appellants.**

Nos. 79–1271, 79–1308.

United States Court of Appeals,
Ninth Circuit.

Feb. 1, 1980.

---

**1194**

Donald B. Marks, Beverly Hills, Cal., Rudolph A. Diaz, Los Angeles, Cal., for defendants-appellants.

Daniel J. Gonzalez, Asst. U. S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before CHAMBERS, ANDERSON and SCHROEDER, Circuit Judges.

PER CURIAM:

Appellants were convicted, after jury trial, of conspiracy to rob a bank (18 U.S.C. § 371) and attempted bank robbery (18 U.S.C. § 2113(a)), and sentenced under the Youth Corrections Act. The evidence as to both counts was overwhelming, but they claim that there was outrageous government misconduct which precluded their prosecution and now compels reversal of their convictions.

Appellants, complete with masks and guns, were arrested as they approached a branch of the Crocker National Bank in Pasadena. It is admitted that they were on their way to rob the bank, pursuant to plans developed by appellant McQuin. The arrests were the result of activity by an F.B.I. informant (a man named Canale) and an undercover agent (Special Agent Taulbee). It was McQuin's testimony at the trial that, although he had participated in the plans for the bank robbery, he had had second thoughts about proceeding with the actual robbery and did so only because of his fear of Taulbee, due to threats purportedly repeated to him by Canale.

The jury obviously chose to reject McQuin's story. But as government misconduct has been put into issue, we shall discuss the evidence as it was presented, despite the jury's resolution of the contradictions in the government's favor. We do this largely to put the claim of outrageous government misconduct in the proper perspective.

Canale had reported to the F.B.I. that appellant McQuin was discussing committing a bank robbery and was seeking an associate who would be armed. Arrangements were made to have Canale introduce Special Agent Taulbee to McQuin. It was necessary that his undercover identity appear authentic and Canale described Taulbee (who was using an assumed name) as a former crime associate, with Mafia connections, and who had collaborated with Canale in several burglaries. McQuin accepted him into the venture immediately. Taulbee testified that McQuin told him on their first meeting that he (McQuin) had ambitions to be a hit man for the Mafia, and volunteered to kill someone as a sort of audition. McQuin denied this but he was obviously impressed with Taulbee.

Their first meeting was on December 11, 1978. Taulbee and Canale drove to McQuin's residence in an F.B.I. undercover car that was fitted with recording devices. McQuin joined them in the car and lost no time in getting down to business. A tape of the rather sordid conversation was introduced into evidence against McQuin and it discloses a well-developed plan by McQuin to rob a specific branch of the Crocker National Bank in Pasadena. McQuin discussed the weapons to be used, the method of gaining entry to the bank, and specifics of gaining control over the bank employees, the getaway plans, and the method by

which the loot would be apportioned. Other unidentified persons were to take part and McQuin speculated on the men who should actually enter the bank and which ones would remain outside. The three men actually drove to the bank and studied its layout; they also drove around its parking lot and the parking lot of an adjoining restaurant—both of which figured in the getaway plans. It was left that the robbery would take place on December 19, at 10:00 a. m. Taulbee was assigned the special job of obtaining getaway cars.

When Taulbee and Canale arrived at the McQuin residence on December 19, a woman appeared at the door and said that he was not at home, but was in jail. He was, in fact, inside. He later testified that he had decided not to go through with the robbery and thus did not want to talk to Canale and Taulbee. Whatever his reasons were for having the woman say that he was not there, he did talk to Canale later in the day. That conversation figures prominently in the appellants' claims of police misconduct.

In the conversation Canale told McQuin that Taulbee was angry and disappointed about the delay in the scheduled robbery, particularly as he had gone to the effort to obtain the getaway cars. (There may well have been some real disappointment given the number of F.B.I. agents on foot, in cars, and in a helicopter left waiting at the bank for a robbery that never occurred.) Just how Canale described Taulbee's anger is in dispute. McQuin testified that Canale told him Taulbee was a "heavy dude" and so angry he was going to have McQuin killed because he had not gone through with the robbery on the 19th as scheduled. Canale denied this and said he merely told McQuin Taulbee was so angry he "felt like" having McQuin killed. Taulbee, of course, was not present and could not testify as to what actually was said. He did, however, take part in the events of the following day. On December 20 he and Canale again went to McQuin's residence, where they were admitted by appellant Johnson. McQuin and some other men were sleeping in a room. Johnson wakened McQuin and the other

men were told to leave the room. Taulbee, McQuin and Canale (with Johnson present) then discussed the robbery. Again the testimony is conflicting. McQuin testified that Taulbee entered the room with drawn gun and stood in front of him in a threatening manner and that he went along with the robbery only because he was so fearful. Agent Taulbee testified that he never drew his gun during the conversation. He stated that McQuin said to him that he had heard that Taulbee was angry and he, not knowing precisely what Canale had said to McQuin, responded noncommittally. His testimony was, "I just said, 'Well, you know,' shrugged it off. I didn't want to say anything . . . I wasn't sure what had been said. I didn't want to say anything that might contradict what had been said [by Canale]." He denied specifically that he ever told McQuin that he "had better go through with the robbery" and he testified that he heard no one else threaten McQuin in that fashion. His testimony was that they merely asked McQuin if he wanted to go through with it, and McQuin responded that he did and that they would rob the bank at 10:00 a. m. that morning. McQuin and Johnson were arrested as they approached the bank; both were wearing masks and carrying guns.

■ As noted, much of the McQuin testimony is contradicted by the testimony of Taulbee and Canale. It is clear that the jury might have chosen to find that Canale's testimony was not credible. He was a drug addict of long standing who admitted to a variety of felony convictions. In addition, he was assured payment by the F.B.I. only if there were an arrest and he testified. But in this case, the fact issues—including these matters of credibility—have been resolved against the appellants, and it is not our function to second-guess the jury in such matters. The issue here is whether there is evidence in this record of "outrageous government misconduct."

■ We have long since recognized that the government may employ undercover tactics to infiltrate criminal ranks and may

rely on paid informants in order to locate and arrest criminals. *United States v. Prairie*, 572 F.2d 1316, 1319 (9th Cir. 1978). This being so, the informants and undercover agents must be permitted, within reason, to assume identities that will be convincing to the criminal elements they have to deal with. The manner of life of the defendants in the case thus dictated, to a large extent, the role that Agent Taulbee had to assume if he were to be accepted into their ranks. We have, on the basis of this record, come to the conclusion that McQuin's life style, in particular, was at a rather low level—requiring Taulbee and Canale, if they were to be convincing, to do and say things that are generally deplored in more civilized parts of our society.

■ Obviously, there are limits to what either an informant or an undercover agent may do, and we have recognized this. As we stated in *United States v. Gonzales-Benitez*, 537 F.2d 1051, 1055 (9th Cir. 1976), the Supreme Court in *United States v. Hampton*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), "left open the possibility that the conviction of a predisposed defendant may be reversed where the government involvement in the criminal scheme reaches such an outrageous level as to violate due process." But the possibility raised in *Hampton* is not applicable to this case.

■ Turning first to Canale's involvement, the evidence is contradictory as to what was said in the conversation of December 19. If, merely for purposes of argument, we accept the McQuin version, we could not view his activity as "outrageous misconduct" any more than we could the threats of the government informant in *United States v. Reynoso-Ulloa*, 548 F.2d 1329, 1338 (9th Cir. 1977). Canale's statements, like those in *Reynoso-Ulloa*, must be "viewed in the context of the vulgarity and 'puffing' engaged in by all participants" in the venture. *Id.* at 1339. The government in its brief describes Canale's conduct as "not commendable." We agree. But we are not disposed to hold, on this record, that it was outrageous misconduct.

■ Turning next to Taulbee's alleged actions on December 20, we note that the district court gave very thorough instructions on predisposition and on burden of proof and the jury clearly declined to accept McQuin's story that he was intimidated into attempting the bank robbery.

The jury could well have declined to accept the McQuin story. His testimony was flatly contradicted by Agent Taulbee's testimony of the events of December 20. Moreover, McQuin's original testimony, suggesting threats with a drawn gun, was severely put into doubt by his later admissions that he was not "threatened" on the 20th and that Taulbee never pointed a gun at him. He admitted that he wanted Taulbee to have a gun in his possession during the robbery and he admitted that at all relevant times on December 20, he was himself armed with a loaded gun. McQuin suffers here from an inability even to establish that the conduct he claims was outrageous even occurred.

■ What has been said as to McQuin's claims of outrageous conduct applies with equal force to appellant Johnson. In addition, Johnson was not the recipient of the alleged threatening statements or conduct and was not even present when they allegedly happened. Clearly, Johnson was not the guiding force behind the bank robbery, as was McQuin, but he was not the naive youth his briefs attempt to paint him. The evidence as to his involvement in the attempted bank robbery was overwhelming; when he was arrested in the parking lot at the bank, he was wearing the ski mask to obscure his features and he was carrying a loaded gun. The record also contains sufficient evidence to support the conviction on the conspiracy charge.

■ The other issues raised by appellants require little discussion. It was entirely proper for the district court to deny appellants' request that the question of outrageous misconduct be referred to the jury as that question was one of law. *United States v. Prairie*, supra, at 1319; *United States v. Gonzales*, 539 F.2d 1238, 1240 fn. 1 (9 Cir. 1976). Furthermore, we are not

persuaded that we should initiate any reversal of this Court's position as stated in *Reynoso-Ulloa.* The other matters raised by the appellants are without merit.

Affirmed.