**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Peter WYLIE, Defendant-Appellant.**

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Sheldon PERLUSS, Defendant-Appellant.**

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**David BACHRACH, Defendant-Appellant.**

**Nos. 79–1362, 79–1363 and 79–1431.**

United States Court of Appeals,
Ninth Circuit.

Submitted Feb. 14, 1980.

Decided July 16, 1980.

Rehearing Denied in No. 79–1363
Sept. 8, 1980.

Harry Hellerstein, Asst. Federal Defender, David Weitzman (on brief), Anne Flower Cumings (on brief), San Francisco, Cal., for defendant-appellant.

Robert Mueller, Asst. U. S. Atty., San Francisco, Cal., for plaintiff-appellee.

Before THORNBERRY,* ANDERSON and SKOPIL, Circuit Judges.

J. BLAINE ANDERSON, Circuit Judge:

The defendants (Wylie, Perluss, and Bachrach) bring this appeal from their convictions on a seven-count indictment charging a large scale LSD manufacturing and distribution operation. They raise several arguments on appeal which fall into three general categories: (1) the adequacy of the government's denial of electronic surveillance; (2) the outrageousness of the government's involvement in the criminal enterprise; and (3) various challenges to the length of sentences which were imposed. We find no reversible error and affirm their convictions. For the reasons stated hereinafter, the sentences are vacated and we remand for resentencing.

I. BACKGROUND

This criminal enterprise had its origin with the defendant Bachrach's dreams of

great wealth. Bachrach, a sometime college teacher, talked with his friend Alfred Bloch about one such scheme for making large amounts of money. The two men discussed the possibility of obtaining ergotamine tartrate (ET) which is used for manufacturing LSD, and the possibility of selling LSD itself. The discussion eventually took concrete form when Bachrach paid $2,000 to send Bloch to Poland in an unsuccessful attempt to obtain LSD crystals.

For reasons which are less than clear, Bloch approached the authorities and agreed to work for them in setting up his friend Bachrach. On instructions from DEA agents, Bloch told Bachrach that he could obtain ET from a source in San Francisco.

On November 24, 1978, Bachrach flew to San Francisco and met two undercover DEA agents who posed as Bloch's "source." Bachrach told the agents that he wanted to obtain one-half to one full kilogram of ET each month for a clandestine LSD lab in Berkeley. In turn, the agents explained to Bachrach that they would supply him with ET in exchange for LSD. Three days later, Bachrach met with the DEA agents and gave them 400 units of LSD, as well as a price list of the different types of LSD which could be supplied. (The list was in the defendant Wylie's handwriting.)

On November 30, Bachrach and Wylie both met with the DEA agents and Wylie bragged about the size of the LSD operation. The parties agreed to exchange 30,000 units of LSD for 100 grams of ET. The next meeting was on December 1, at which time Bachrach gave 30,000 units of LSD to the agents for a bottle of ET pursuant to the earlier agreement.

This was followed by Bachrach's sale of 2,000 tablets of LSD to the agents on December 7 in exchange for $900. A week later, Bachrach gave the agents a shopping list (handwritten by Wylie) of additional chemicals which were needed. These chem-

---

* The Honorable Homer Thornberry, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation.

icals were given to Bachrach on January 2, 1979. Bachrach turned these chemicals over to Donald Goetz[1] the next day. Goetz then gave them to Wylie. In turn, Wylie transferred the chemicals to Perluss on the following day.

Meanwhile, on January 3, Bachrach and Wylie exchanged 54,000 units of LSD for 100 grams of ET. The final exchange took place on January 18 when Bachrach gave 226,400 units of LSD to the agents in exchange for more ET. The defendants were all arrested on January 18. The residence of Perluss was searched and a number of chemicals and formulas used for manufacturing LSD were found.

All of the defendants were charged with conspiracy to manufacture and distribute LSD in violation of 21 U.S.C. § 846 (Count 1). Wylie and Bachrach were charged with four counts for the actual distribution of LSD in violation of 21 U.S.C. § 841(a)(1) (Counts 2 through 5). These substantive counts were based on the four different exchanges which occurred on November 27, December 1, December 7, and January 3. The sixth count charged Wylie, Bachrach, and Perluss with distribution (21 U.S.C. § 841(a)(1)) based on the exchange of the 226,400 units of LSD on January 18. And finally, the seventh count, charged Wylie and Bachrach with the use of a telephone to facilitate distribution of LSD in violation of 21 U.S.C. § 843(b). After a six-day trial, on April 4, 1979, a jury found the defendants guilty on all counts.

Bachrach, who was found guilty on all seven counts, was sentenced to a total of fifteen years.[2] Wylie, who was also convicted on all seven counts, was sentenced to twenty years.[3] And Perluss, who was found guilty on the two counts charged against him, was sentenced to a total of seven years.[4]

After sentencing, the defendants all filed timely notices of appeal. This court has jurisdiction under 28 U.S.C. § 1291 to consider their claims of error.

## II. DISCUSSION

### 1. Electronic Surveillance

Prior to trial, counsel for Perluss filed a claim under 18 U.S.C. § 3504 asserting that she had been the subject of illegal electronic surveillance in connection with her representation of Perluss. The government made a general denial of any such electronic surveillance. Perluss' counsel then filed a supplemental affidavit in support of the § 3504 claim. The government responded by filing a more detailed denial of electronic surveillance. On appeal, Perluss argues that the government's denial was inadequate and asks this court to remand to the district court for an evidentiary hearing on the electronic surveillance claim.

When a defendant makes a prima facie showing that he or his attorney was

---

1. Goetz was also tried and convicted of the charges against him for his role in the conspiracy. Prior to sentencing, he disappeared. He therefore is not a party to this appeal.

2. Bachrach was sentenced as follows:
 Count 1—five years plus special parole term of five years;
 Count 2—three years plus special parole term of two years, concurrent to Count 1;
 Count 3—five years plus special parole term of two years, consecutive to Count 1;
 Count 4—four years plus special parole term of two years, concurrent to Count 3;
 Count 5—five years plus special parole term of two years, consecutive to Count 3;
 Count 6—five years plus special parole term of two years, concurrent to Count 5;
 Count 7—two years, concurrent to Count 5.

3. Wylie was sentenced as follows:
 Count 1—five years plus special parole term of five years;
 Count 2—three years plus special parole term of three years, concurrent to Count 1;
 Count 3—five years plus special parole term of five years, consecutive to Count 1;
 Count 4—four years plus special parole term of four years, concurrent to Count 3;
 Count 5—five years plus special parole term of five years, consecutive to Count 3;
 Count 6—five years plus special parole term of five years, consecutive to Count 5;
 Count 7—two years, concurrent to Count 6.

4. Perluss was sentenced as follows:
 Count 1—four years plus five-year special parole term;
 Count 6—three years plus five-year special parole term, consecutive to Count 1.

subjected to electronic surveillance, the burden then shifts to the government to "unequivocally affirm or deny the use of such surveillance." *United States v. Gardner*, 611 F.2d 770, 774 (9th Cir. 1980); *United States v. See*, 505 F.2d 845, 855–856 (9th Cir. 1974), *cert. denied*, 420 U.S. 992, 95 S.Ct. 1428, 43 L.Ed.2d 673. *United States v. Alter*, 482 F.2d 1016, 1026–1027 (9th Cir. 1973). Because this could place an awesome burden on the government to respond to frivolous claims, we have established specific requirements for the defendant to satisfy in order to make out a colorable claim. *See, supra*, 505 F.2d at 856.[5] In addition, the "specificity of the prosecution's denial and the comprehensiveness of the search on which the denial is predicated must be measured against the specificity of the allegations of unlawful electronic surveillance and the strength of the support for those allegations." *Gardner, supra*, 611 F.2d at 774. And finally, the task of striking a balance between "the conflicting and sensitive interests at stake" when this type of question arises, "properly lies with the district court." *Alter, supra*, 482 F.2d at 1026.

In the supplemental affidavit submitted by Perluss' counsel, she stated that on March 19, 1979, she held a conference with Perluss between eleven and noon. Before, during and after the conference, her cousin was in her house and used her phone. Her cousin informed her that the use of the phone was normal before and after the conference with Perluss. However, the use of the phone during the time of the confer-

ence "consistently had a conversation in the background between two persons." Based on the events related to her by her cousin, Perluss' attorney stated that she believed "there was an unauthorized, governmental interception of wire and/or oral communications during the attorney-client conference at her home on March 19, 1979, between the hours of eleven and noon."

The district court found that this affidavit raised a question of electronic surveillance and ordered the government to make a check of the relevant agencies to determine if there had been any illegal electronic surveillance. The government attorney who was in charge of the prosecution of this case responded with a declaration which denied any such electronic surveillance of Perluss or his attorney. The government attorney stated that he was unaware of any electronic surveillance except for that which had already been disclosed to the defendants (and was not at issue). Incorporated into the declaration was the summary of the Justice Department's search of the records from the different government agencies.[6] The search disclosed no evidence that on March 19, 1979, either Perluss or his attorney was subjected to surveillance by electronic, mechanical, or other reception device. And lastly, the government offered the statement by the agent who was in charge of the investigation into this case. The agent stated unequivocally that at no time was any type of wiretap or area bug ever used during the investigation of the case. The only electronic surveillance

---

**5.** In *Alter, supra*, this court said that in order to make out a prima facie issue of electronic surveillance, the affidavits or other evidence must reveal:

 (1) the specific facts which reasonably lead the affiant to believe that named counsel for the [defendant] has been subjected to electronic surveillance;

 (2) the dates of such suspected surveillance;

 (3) the outside dates of representation of the [defendant] by the lawyer during the period of surveillance;

 (4) the identity of the person(s) . . . with whom the lawyer . . . was communicating at the time the claimed surveillance took place; and

 (5) facts showing some connection between possible electronic surveillance and the [defendant] who asserts the claim or the [trial] in which the [defendant] is involved.

*See Alter, supra*, 482 F.2d at 1026.

**6.** The records of the following agencies were searched, and no evidence was found to support Perluss' claim of electronic surveillance: Federal Bureau of Investigation; Bureau of Alcohol, Tobacco & Firearms; United States Customs Service; Drug Enforcement Administration; United States Postal Service; United States Secret Service; Internal Revenue Service; Central Intelligence Agency; and the National Security Agency.

which had been utilized involved the use of body recorders worn by the undercover agents during their meetings with the defendants, and the undercover agents' recording of their telephone conversations with the defendants (as mentioned earlier, these had been disclosed and were not at issue).

■ We believe that the district court struck the proper balance between the conflicting and sensitive interests which were raised by the electronic surveillance question. Perluss' claim raised a colorable question. Although it may not have satisfied the detailed requirements of *Alter, supra,* the district court ordered the government to respond. After conducting searches of the different agency records, the government denied the claim. In addition, the two principal government officers who were involved in the case unequivocally denied any electronic surveillance as alleged by Perluss. While the government could have filed a more detailed denial, we believe that the one which was filed, when measured against Perluss' claim, provided a sufficient basis to support the district court's finding that there had been no electronic surveillance. It should be remembered that, as a practical matter, it is oftentimes difficult to prove a negative. *See Weimerskirch v. C. I. R.,* 596 F.2d 358, 361 (9th Cir. 1979). We hold that the government's denial of electronic surveillance was adequate and no further proceedings are necessary on this question.

#### 2. *Outrageous Involvement*

The defendants argue that the involvement of the DEA agents in the criminal enterprise was so improper that it amounted to a violation of due process. This argument is based on the following sequence of events. Bloch initially "set up" Bachrach by having him meet undercover DEA agents. According to Bachrach, he only intended to purchase ET (a necessary ingredient for making LSD); and it was the DEA agents who suggested that they receive payment in LSD. Thereafter, Bachrach brought in Wylie and Perluss, who attempt to ride vicariously on the coattails of Bachrach's argument. The defendants claim that the agents were able to set up the different exchanges in order to add additional charges.

We have no trouble at all in rejecting all of the defendants' different phrasings of their due process arguments.

Initially, it should be noted the defendants cannot claim entrapment. An entrapment instruction was given to the jury. By convicting the defendants, the jury obviously rejected the entrapment defense and thereby found that the defendants had been predisposed to commit the crimes.

■ On appeal, the defendants rely on the close relative of the entrapment defense which may be referred to as the outrageous involvement defense.[7] The Supreme Court has observed that due process may bar a conviction where the government's involvement in a criminal enterprise has become sufficiently outrageous and shocking to the universal sense of justice. *See United States v. Russell,* 411 U.S. 423, 431–432, 93 S.Ct. 1637, 1642–1643, 36 L.Ed.2d 366 (1973); *Hampton v. United States,* 425 U.S. 484, 495, 96 S.Ct. 1646, 1652, 48 L.Ed.2d 113 (1976) (Powell, J., concurring). This court has recognized that a criminal defendant may have a due process defense when the government's involvement has been sufficiently outrageous. *United States v. McQuin,* 612 F.2d 1193, 1196 (9th Cir. 1980), *cert. denied,* —— U.S. ——, 100 S.Ct. 1607, 63 L.Ed.2d 791; *United States v. Prairie,* 572 F.2d 1316, 1319 (9th Cir. 1978); *United States v. Gonzalez,* 539 F.2d 1238, 1239 (9th Cir. 1976); *United States v. Gonzales-Benitez,* 537 F.2d 1051, 1055 (9th Cir. 1976), *cert. denied,* 429 U.S. 923, 97 S.Ct. 323, 50 L.Ed.2d 291. Not only do we have no prob-

---

7. The defendants refer to this as "governmental creative activity," which is a mischaracterization of the defense upon which they seek to rely. The decisions which established this defense focus on the *outrageousness* of the gov-

ernmental agents' involvement in the criminal activity. Any consideration of the creativity exercised by the government agents is secondary to the consideration of the outrageousness of their involvement.

lem whatsoever in concluding that the government's involvement in this case was not outrageous enough to trigger the protection of the due process clause, but we do not see how the action of the undercover agents may be characterized as anything but good, solid undercover investigative work.[8]

■ First of all, it is well established that "the government may employ undercover tactics to infiltrate criminal ranks and may rely on paid informants in order to locate and arrest criminals." *McQuin, supra,* 612 F.2d at 1196; *Prairie, supra,* 572 F.2d at 1319. The mere fact that Bloch was a paid informant, and the two agents were operating undercover does not provide any support to the defendants' argument.

Bachrach's contention that the agents initiated the idea that LSD would be exchanged for ET also does not afford any support to the outrageousness claim. After all, Bachrach's predisposition toward the sale of LSD was abundantly clear in the record. And there is no indication that Bachrach even as much as hesitated at using LSD as the medium of exchange for the ET.

■ Bachrach and Wylie make much of the series of transactions which were separately charged in the indictment. This does not create any problem in the present case. The agents were investigating a continuing large scale LSD manufacturing and distribution ring. In order to find as many of the participants as possible, it was entirely proper for the agents, given the posture of this case, to carry out a series of exchanges. Likewise, we can perceive nothing sinister in the United States Attorney's decision to charge the separate offenses. *See United States v. Batchelder,* 442 U.S. 114, 123–124, 99 S.Ct. 2198, 2203–2204, 60 L.Ed.2d 755 (1979); *Bordenkircher v. Hayes,* 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (1978).[9]

■ And finally, the defendants argue that an instruction on outrageous involvement should have been submitted to the jury. It was entirely proper for the district court to deny this request. The question of the outrageous involvement of government agents is a question of law for the court. *McQuin, supra,* 612 F.2d at 1196–1197; *Prairie, supra,* 572 F.2d at 1319; *Gonzalez, supra,* 539 F.2d at 1240 n.1.[10]

---

**8.** As the Supreme Court said in *Russell, supra*:
"The illicit manufacture of drugs is not a sporadic, isolated criminal incident, but a continuing, though illegal, business enterprise. In order to obtain convictions for illegally manufacturing drugs, the gathering of evidence of past unlawful conduct frequently proves to be an all but impossible task. Thus in drug-related offenses law enforcement personnel have turned to one of the only practicable means of detection: the infiltration of drug rings and a limited participation in their unlawful present practices. Such infiltration is a recognized and permissible means of investigation; if that be so, then the supply of some *item* of value that the drug ring requires must, as a general rule, also be permissible. For an agent will not be taken into the confidence of the illegal entrepreneurs unless he has something of value to offer them. Law enforcement tactics such as this can hardly be said to violate "fundamental fairness" or "shocking to the universal sense of justice" . . . ." *(citations omitted)* 411 U.S. at 432, 93 S.Ct. at 1643.

**9.** Justice Stewart made the following observation about the discretion of prosecutors in deciding what charges to file and proceed upon:

"In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion. Within the limits set by the legislature's constitutionally valid definition of chargeable offenses, 'the conscious exercise of some selectivity in enforcement is not itself a federal constitutional violation' so long as 'the selection was [not] deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification.'" *(citations and footnotes omitted)*
*Bordenkircher, supra,* 434 U.S. at 364, 98 S.Ct. at 668–669.

**10.** Perluss recognizes that *Prairie, supra,* and *Gonzalez, supra,* represent the law of this circuit and as such are binding on this panel. Because of this, Perluss suggests that the question of whether such an instruction ought to be submitted to the jury should be heard by this court sitting en banc. Fed.R.App.P. 35(a) explains that en banc hearings are disfavored and generally are only ordered when there is (1) an intracircuit conflict, or (2) a question of excep-

We conclude that the trial court was correct in refusing to find, as a matter of law, outrageous involvement by the government agents.[11] And, the defendants were not entitled to have a jury instruction on this question.

### 3. Sentences

The defendants make several broad sweeping arguments against the sentences which they received. As pointed out earlier, Bachrach was sentenced to fifteen years based on the three separate consecutive sentences; Wylie was sentenced to twenty years based on four separate consecutive sentences; and Perluss was sentenced to seven years based on two separate consecutive sentences. We find no merit to any of the defendants' contentions about the impropriety of their sentences.

Prior to our consideration of the defendants' arguments, it should be noted that a district judge has wide discretion in determining what sentence to impose. *United States v. Tucker*, 404 U.S. 443, 446–447, 92 S.Ct. 589, 591–592, 30 L.Ed.2d 592 (1972). As long as the sentence is within statutory limits, it is generally not subject to review on appeal. *Id.*

Bachrach says that common sense should tell the court that he, the "least culpable" member of the conspiracy, should not have been sentenced to eight more years than Perluss, the "most culpable" member of the conspiracy. Not only is there no legal support for this argument, but it is also refuted by the fact that Bachrach was charged and convicted on seven counts, whereas Perluss was only charged and convicted on two.

Both Bachrach and Wylie claim that they should not have received consecutive sentences. We find nothing wrong with the use of consecutive sentences to punish Bachrach and Wylie. After all, consecutive sentences can be imposed after convictions for conspiracy and the underlying substantive offense. *Iannelli v. United States*, 420 U.S. 770, 777–778, 95 S.Ct. 1284, 1289–1290, 43 L.Ed.2d 616 (1975); *United States v. Kearney*, 560 F.2d 1358, 1365–1367 (9th Cir. 1977), *cert. denied*, 434 U.S. 971, 98 S.Ct. 522, 54 L.Ed.2d 460. In addition, consecutive sentences can be imposed for the separate commission of the same crime. *See United States v. Long*, 524 F.2d 660, 661–662 (9th Cir. 1975); *United States v. Taxe*, 572 F.2d 216, 217 (9th Cir. 1978), *cert. denied*, 436 U.S. 918, 98 S.Ct. 2265, 56 L.Ed.2d 759. As with most areas of sentencing, the use of consecutive sentences lies within the discretion of the district court. *United States v. Dubrofsky*, 581 F.2d 208, 214 (9th Cir. 1978). Neither Bachrach nor Wylie is able to show any reason why these rules should be departed from in their cases.

Wylie correctly states that the maximum sentence for first offenders (like himself) under 21 U.S.C. § 841(b)(1)(B) is five years. Based on this, Wylie argues that he should have only been sentenced to a total of five, rather than twenty years. We disagree. Wylie was charged and convicted with six separate offenses punishable under 21 U.S.C. § 841(b)(1)(B). There is nothing in either the language of the statute or the legislative history which can be read in support of Wylie's argument that the maximum sentence for one violation of the statute also serves as the maximum

tional importance. There is no conflict within this circuit, nor is this a question of exceptional importance. We therefore decline to recommend that the full court consider the appropriateness of an en banc hearing on this question.

11. The defendants place great reliance upon this court's opinion in *Greene v. United States*, 454 F.2d 783 (9th Cir. 1971), and the Third Circuit's opinion in *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978). The government's minimal involvement in the present case falls far short of the intolerable overreaching which was condemned in those two decisions. Moreover, under the unique circumstances of *Greene, supra*, "it was established that the Government, through its agent, directly and continuously involved itself in the creation and maintenance of the criminal operations." *United States v. Granger*, 475 F.2d 1022, 1024 (9th Cir. 1973), *cert. denied*, 412 U.S. 929, 93 S.Ct. 2757, 37 L.Ed.2d 157. There was no such involvement here.

sentence when there are five other separate violations of the same statute. *See, e. g., United States v. Valot,* 481 F.2d 22, 25–26 (2d Cir. 1973); *Dubrofsky, supra,* 581 F.2d at 213. Therefore, the maximum sentence which Wylie could have received for his six separate convictions under 21 U.S.C. § 841(b)(1)(B) was six consecutive five-year terms, or a total of thirty years.

 In addition, Wylie claims that his sentence to twenty years amounts to cruel and unusual punishment in violation of the Eighth Amendment. Since Wylie's sentence was within the statutory maximum, it was not cruel and unusual. *United States v. Washington,* 578 F.2d 256, 258 (9th Cir. 1978); *see, e. g., Rummel v. Estelle,* —— U.S. ——, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980).

Unlike Bachrach and Wylie, Perluss was only charged with the one conspiracy count (Count 1) and the one distribution count (Count 6). He concedes that these offenses involve separate crimes. Nevertheless, he argues that his consecutive sentences of four years on the conspiracy count and three years on the distribution count were constitutionally improper because of an instruction which was given to the jury. We recognize that there is a certain amount of logical appeal to Perluss' argument, but nevertheless reject it.[12]

There was no evidence linking Perluss to the distribution charge in Count 6. Because of this, the court gave the *Pinkerton* in-

struction at the government's request.[13] This instruction told the jury that as long as they found Perluss guilty of the conspiracy charged in Count 1, then he could also be convicted of the substantive distribution charge in Count 6 if one of Perluss' fellow conspirators had committed that offense. For the prosecution to prove its case against Perluss on the distribution charge, it only had to show the statutory elements of the conspiracy charge plus one additional element, that is, that one of the other co-conspirators had actually distributed the LSD as charged in Count 6.

 The Double Jeopardy Clause protects against multiple punishments for the same offense. *Simpson v. United States,* 435 U.S. 6, 11 n.5, 98 S.Ct. 909, 912 n.5, 55 L.Ed.2d 70 (1978); *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969). Since Perluss received consecutive sentences for the conspiracy conviction and the distribution conviction, he claims that he is receiving double punishment for the same offense.

 The basic premise to Perluss' argument is that the conspiracy charge merged or became the same offense with the distribution charge after the *Pinkerton* instruction was given. In support of this premise, he relies upon the *Blockburger* test. *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). Where the same act or transaction constitutes a viola-

---

**12.** Perluss also suggested in his opening brief that this issue should be considered by the court sitting en banc. We decline to follow his suggestion. *See* n.10 *supra.*

**13.** This instruction derived its name from *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), where its use was approved by the Supreme Court. The court below instructed the jury as follows:

"Now, if you find that a particular defendant *is guilty of conspiracy as charged in* Count One, you may also find that defendant guilty of a substantive offense as charged in any other count of the indictment, provided that you find that the essential elements of that count as defined in these instructions have been established beyond reasonable doubt, and provided that you also find beyond reasonable doubt,

"First, that the offense defined in the substantive count was committed pursuant to the conspiracy, and

"Second, that the particular defendant was a member of the conspiracy at the time the substantive offense was committed.

"Under the conditions just defined, a defendant may be guilty of a substantive count even though he did not participate in the acts constituting the offense as defined in the substantive count.

"The reason for this is that a co-conspirator committing a substantive offense pursuant to a conspiracy is held to be the agent of the other conspirators."

This followed the pattern instruction. 2 Devitt & Blackmar, Federal Jury Practice and Instructions (West 1977) § 27.17.

tion of two distinct statutory provisions, the *test* which is applied for determining whether there are two offenses or only one turns on "whether each provision requires proof of a fact which the other does not." *Id.* at 304, 52 S.Ct. at 182. The "proof of a fact" referred to under this test does not simply relate to whether the same evidence is used at trial to prove the two charges.[14] Instead, the test focuses on the statutory elements of the different offenses. *United States v. Ohlson*, 552 F.2d 1347, 1349–1350 (9th Cir. 1977).

As a general rule, a substantive charge, and conspiracy charge based on the substantive charge, pass muster under the *Blockburger* test and retain their separateness. *Iannelli, supra*, 420 U.S. at 785 n.17, 95 S.Ct. at 1293 n.17; *Kearney, supra*, 560 F.2d 1365–1367. The reason for this is because a requirement for a conspiracy conviction is proof of an agreement which is not necessary to prove an underlying substantive count. *Kearney, supra*, 560 F.2d at 1367. And, conviction on the substantive count will require the consummation of the crime, which, of course, is not essential for completing the crime of conspiracy. *Id.*

However, in this case, this distinction between the two offenses no longer holds true because of the *Pinkerton* instruction. The jury was told that in order for Perluss to be found guilty of the distribution charge, they only needed to find him guilty of the conspiracy charge and find that a co-conspirator had undertaken the actual distribution charged in Count 6. The agreement necessary to prove the conspiracy charge was also necessary to prove the distribution charge. Because this instruction was given, the conspiracy charge no longer required proof of an element that the distribution charge did not. Therefore, under *Blockburger*, Perluss claims that he should not have received consecutive sentences for this had the effect of punishing him twice for the same offense.

Although we acknowledge the logic to Perluss' reasoning, nevertheless, the preceding discussion does not serve as a basis for granting any relief to him because it is based on the erroneous assumption that the *Blockburger* test, when applied to consecutive sentences, states a rule of constitutional dimensions, which it in fact does not. The test articulated in *Blockburger* is merely a method for ascertaining the congressional intent to impose separate punishment for multiple offenses which arise during the course of a single act or transaction. *Iannelli, supra*, 420 U.S. at 785 n.17, 95 S.Ct. at 1293 n.17.

The question of whether a court may constitutionally impose multiple punishments is resolved by determining what punishment the legislative branch has authorized. *Whalen v. United States*, —— U.S. ——, ——, 100 S.Ct. 1432, 1436, 63 L.Ed.2d 715, 721 (1980). The role of the Double Jeopardy Clause, where consecutive sentences are imposed at a single criminal trial, "is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense." *Brown v. Ohio*, 432 U.S. 161, 165, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977). And so, the dispositive question in resolving Perluss' challenge is whether Congress authorized cumulative punishments for the conspiracy and distribution offenses. *See Whalen, supra*, —— U.S. at ——, 100 S.Ct. at 1436, 63 L.Ed.2d at 722.

Both of the statutes under which Perluss was convicted (21 U.S.C. § 846, and 21 U.S.C. § 841(a)(1)) were part of the Comprehensive Drug Abuse Prevention and Control Act of 1970. 21 U.S.C. §§ 801, *et seq.* We find nothing in either the Act or the legislative history which would indicate that Congress intended to depart from the general rule that courts can impose separate sentences for the conspiracy to commit an offense and the accomplishment of the substantive offense itself. *See H.R.Rep. No. 91–1444, 91st Cong., 2d Sess., reprinted*

---

**14.** Perluss asked us to follow the same evidence test of *United States v. Austin*, 529 F.2d 559 (6th Cir. 1976). This court has repudiated this approach on a previous occasion. *Kearney, supra*, 560 F.2d at 1365–1367.

*in* 3 [1970] U.S.Code Cong. & Admin.News, p. 4566. In fact, we agree with the Second Circuit when it made the following observation:

"The structure and legislative history of the drug abuse act provide persuasive evidence that, because of the special dangers which conspiracies to distribute controlled drugs pose to society, Congress did intend that a conspiracy to violate the Act should constitute a separate crime in addition to the substantive offense."

*United States v. Bommarito*, 524 F.2d 140, 143–144 (2d Cir. 1975); *accord Curtis v. United States*, 546 F.2d 1188, 1190 (5th Cir. 1977), *cert. denied*, 431 U.S. 908, 97 S.Ct. 1705, 52 L.Ed.2d 393. In addition, this court has found that Congress intended to impose dual punishments for conspiracies which violate two different sections of this same Act. *United States v. Marotta*, 518 F.2d 681, 685 (9th Cir. 1975) (defendant was convicted for conspiring to distribute marijuana under 21 U.S.C. § 846 and conspiring to import the same marijuana under 21 U.S.C. § 963).

 Based on the preceding, we conclude that Congress did intend to allow the courts to impose consecutive sentences for conspiracy (21 U.S.C. § 846), and for substantive offenses (21 U.S.C. § 841(a)(1)), even when the proof necessary to obtain a conviction for the former was necessary to obtain a conviction for the latter offense.[15] Because we make this finding, we do not apply the *Blockburger* test for ascertaining the legislative intent. The consecutive sentences imposed upon Perluss were therefore proper.

## III. THE BIFULCO PROBLEM

 After argument and submission of these appeals, the Supreme Court decided *Bifulco v. United States*, —— U.S. ——, 100 S.Ct. 2247, 64 L.Ed.2d —— (1980). The sentences imposed upon Bachrach, Wylie and Perluss on Count I, the conspiracy count, carried a special parole term of five years. Under *Bifulco*, the district court was without power to impose the special parole term on Count I. This issue was not raised by any defendant in this case. Nevertheless, we recognize the sentencing defect and vacate the special parole term imposed on each defendant under Count I.

## IV. CONCLUSION

The defendants were participants in a large business enterprise which manufac-

---

**15.** Had we applied the *Blockburger* test, it is likely that we would have upheld Perluss' consecutive sentences anyway.

Perluss asserted that the issue he raised was one of first impression. Since the government chose to gloss over the question in its brief, we presume that it did not find any cases which involved the interface between the *Blockburger* test and the *Pinkerton* instruction when consecutive punishment is imposed. This panel is aware of two decisions which have inferentially involved this question.

In *United States v. Larkin*, 605 F.2d 1360, 1363–1369 (5th Cir. 1979), the Fifth Circuit made note of the potential problem which arose when the *Pinkerton* instruction was given, but then did not find it necessary to address the question.

And the decision which is most on point, had we addressed the problem presented by the interface between the *Pinkerton* instruction and the *Blockburger* test, is the *Pinkerton* decision itself. 328 U.S. at 640, 66 S.Ct. 1180, 90 L.Ed. 1489. In *Pinkerton*, Daniel was found to have been a member of the conspiracy and therefore the jury found him guilty on the conspiracy count. However, since he had been incarcerated during the time of the acts which formed the basis for the substantive charges, the only way that the jury could have found him guilty was based on the aforementioned instruction. *See* n.13, *supra*. Daniel had been sentenced on the substantive counts to imprisonment for thirty months and a fine of $1,000. On the conspiracy count, Daniel had received a two year sentence (running concurrently with the thirty month sentence) plus a $500 fine. It might be said that since Daniel received concurrent sentences, the *Pinkerton* decision did not involve the same problem with which we are faced here where Perluss received consecutive sentences. However, fines "are treated in the same way as prison sentences for purposes of double jeopardy and multiple punishment analysis." *Jeffers v. United States*, 432 U.S. 137, 155, 97 S.Ct. 2207, 2218, 53 L.Ed.2d 168 (1977). Since Daniel received separate fines in *Pinkerton*, the Supreme Court was implicitly faced with the same question as Perluss raises in the present case. By affirming Daniel's convictions and his punishment, the Court impliedly approved the use of consecutive punishment in those cases where the *Pinkerton* instruction is given.

tured and distributed LSD. In order to prevent such business operations from flourishing, a limited amount of government infiltration through undercover agents must be tolerated. While the penalties which were imposed on the defendants may have been severe, they were amply justified by the large scale nature of the illegal enterprise and the roles performed by the respective defendants.

The convictions of the defendants are AFFIRMED. The special parole term imposed on each defendant under Count I is VACATED.