UNITED STATES of America, Plaintiff,

v.

Carlos MARCELLO, Samuel Orlando Sciortino, and Phillip Rizzuto, Defendants.

No. Cr. EJD–81–720.

United States District Court, C. D. California.

May 4, 1982.

Andrea Sheridan Ordin, U. S. Atty., James D. Henderson, Bruce J. Kelton, Los Angeles Strike Force, Dept. of Justice, Los Angeles, Cal., for U. S.

Arthur A. Lemann, III, and Provino C. Mosca, New Orleans, La., for defendant Marcello.

Richard Caballero, Beverly Hills, Cal., for defendant Sciortino.

Thomas R. Dyson, Jr., Washington, D. C., for defendant Rizzuto.

AMENDED

## MEMORANDUM & ORDER DENYING MOTION TO DISMISS FOR GOVERNMENT OVERREACHING

DEVITT, Senior District Judge.

Defendants have moved to dismiss the indictment due to government overreaching. This motion was made prior to the trial; ruling was deferred until after trial. *See* Fed.R.Crim.P. 12(e); *United States v. Kaplan*, 554 F.2d 958, 970, n.7 (9th Cir. 1977), *cert. denied sub nom. Vogt v. United States*, 434 U.S. 956, 98 S.Ct. 483, 54 L.Ed.2d 315 (1977); *United States v. Marcello*, 508 F.Supp. 586, 593–95 (E.D.La. 1981); *United States v. Jannotti*, 501 F.Supp. 1182 (E.D.Pa.1981), *rev'd on other grounds*, 673 F.2d 578 (3d Cir. 1982).

Defendants were charged in a three count indictment with a conspiracy to bribe United States District Judge Harry Pregerson of the Central District of California in order to obtain favorable treatment for defendant Sciortino and others in a criminal prosecution over which Judge Pregerson was presiding. Count 1 charged the defendants with conspiracy to bribe a public official in violation of 18 U.S.C. §§ 371 and 201(b); Count 2 charged them with corruptly endeavoring to influence an officer of the United States Courts and aiding and abetting in violation of 18 U.S.C. §§ 1503 and 2; and Count 3 charged the defendants with using the facilities of interstate commerce to carry on unlawful activity and aiding and abetting in violation of 18 U.S.C.

§§ 1953 and 2. Defendant Marcello was found guilty by a jury on all counts; defendant Sciortino was found guilty on Count 2, with the jury unable to reach a verdict on Counts 1 and 3; and defendant Rizzuto was found guilty on Counts 1 and 2, and acquitted on Count 3.

Evidentiary hearings on this motion were held after trial on February 12 and April 5–7, 1982, at the conclusion of which the court orally denied defendants' motion to dismiss the indictment. In connection with this motion, the defendants moved the court to conduct an *in camera* inspection of the entire government case file concerning the "Brilab" investigation, and to turn over to defendants materials referring to Judge Pregerson and government instructions and guidelines relating to the conduct of undercover operations. A similar motion was made with regard to the files of the Federal Bureau of Investigation. The court inspected the files so produced, which the prosecutor and responsible FBI agent represented were the entire government and FBI files relating to these matters. Pertinent materials were turned over to the defendants pursuant to orders dated February 12, 1982 and February 26, 1982. All of the files produced have been sealed and marked as Court Exhibits 2 and 3.

Defendants contend that the indictment must be dismissed on the ground that the conduct of government agents in connection with the investigation and prosecution of this case was so outrageous that it violated the defendants' rights to due process as guaranteed by the Fifth Amendment. The basis for this motion as originally brought and briefed was that the government created and promoted the conspiracy to bribe Judge Pregerson in order to force the judge to recuse himself from presiding over a criminal prosecution in which defendant Sciortino was a defendant.[1] After the

---

1. Sciortino and five other individuals were indicted in *United States v. Brooklier, et al.*, No. Cr. 79–126HP on February 20, 1979 by a grand jury sitting in the Central District of California on charges of racketeering, conspiracy, extortion, obstruction of justice and murder in viola-

tion of the RICO statute and other applicable federal statutes. Judge Pregerson was assigned to preside over this case. The government's lead counsel in the *Brooklier* case was Department of Justice Special Attorney James Henderson who was attorney-in-charge of the

hearings on this motion, the defendants conceded and this court agrees, that they failed to make such a showing. Defendants now contend, however, that the government's conduct in the investigation of this case constituted an outrageous and unprecedented attempt by the government to tamper with a defendant in a pending criminal case, and constituted outrageous and unwarranted interference with the province of the federal judicial branch.

In attempting to show the alleged outrageous conduct on the part of the government, the defense has focused on several conversations between government informant Hauser and the defendants which occurred in late 1979. Hauser was a key figure in the government's undercover investigation commonly referred to as "Brilab," which involved investigation of alleged bribery of public officials in the State of Louisiana in order to obtain insurance contracts. *See United States v. Marcello,* 508 F.Supp. 586 (E.D.La.1981). In this connection, Hauser was in frequent contact with defendant Marcello during late 1979. The relevant conversations were recorded as the result of court-ordered and consensual interceptions.

On October 4, 1979, in a telephone conversation between Marcello and Rizzuto, Marcello inquired of Rizzuto, who is Sciortino's cousin, whether he had read an article in the local New Orleans newspaper regarding "this man" from California, and asked if that was the same person about whom Rizzuto had talked with Marcello the previous evening. Evidence at trial showed that Marcello was referring to a newspaper article regarding statements made by Judge Pregerson during Senate hearings regarding confirmation of his appointment to the Court of Appeals for the Ninth Circuit. Later that same day in a telephone conversation between Marcello and Hauser, Marcello told Hauser about the article in the paper, and a discussion about Judge Pregerson ensued. Marcello informed Hauser that he knew people scheduled to go to trial before Judge Pregerson the following Monday. Hauser, who was made aware of the earlier Marcello-Rizzuto conversations by the F. B. I., told Marcello he knew the judge, and that there were things he might be able to do. In another conversation the same day with Rizzuto, Marcello informed him that he knew someone who knew Judge Pregerson with whom Rizzuto would want to talk.

The evidence has shown that Hauser did not in fact know Judge Pregerson, but represented to Marcello that he did in order to determine why Marcello was interested in the judge. Hauser immediately informed the FBI undercover agents with whom he

Los Angeles Strike Force and had responsibility for supervising the Brilab investigation. In connection with this assignment, Henderson was involved with the investigation of the instant case from its inception, and was the government's lead counsel at the instant trial.

Defense contentions that the government created the instant conspiracy in order to force Judge Pregerson's recusal are apparently based on the government's purported displeasure with Judge Pregerson after he dismissed, without prejudice, the *Brooklier* indictment on two occasions because the case was not properly indicted. (The first dismissal was granted because a Grand Juror brought a Time magazine article and several Los Angeles Times stories containing information concerning the case into the Grand Jury room. The articles were seen and discussed by some members of the Grand Jury before they voted. The second dismissal was granted because less than 12 Grand Jurors who returned the indictment heard all the evidence.) Defendants contended that the government created the conspiracy and informed Judge Pregerson of its existence under the guise of concern over its duty to disclose statements made by defendant Sciortino that he was innocent of the crimes charged in the *Brooklier* case. These statements were made in a consensually intercepted conversation between Sciortino and government informant Joseph Hauser on October 25, 1979. An *ex parte in camera* motion was made by the government in the *Brooklier* case on November 15, 1979 pursuant to Rule 16 to limit the discovery of Sciortino's statements. As a result of this motion, Judge Pregerson became aware of the existence of the conspiracy to bribe him. At the request of the government, he postponed recusing himself from the *Brooklier* case until February 1980, to permit the government to maintain the secrecy of the entire "Brilab" investigation in which government informer Hauser and F. B. I. undercover personnel were involved.

was working in New Orleans of the conversation regarding Judge Pregerson, who in turn informed Special Agents William Fleming and John Barron of the Los Angeles Field Office of the FBI, who had responsibility for supervising Hauser's activities. Agent Barron was also the supervising agent on the *Brooklier* case. Barron testified that he consulted with Strike Force Attorney Henderson regarding the matter. Agent Fleming instructed Hauser to inquire further of Marcello regarding his interest with the judge.

Between October 4 and October 11, 1979, Agents Fleming and Barron instructed Hauser to inform Marcello that Hauser had a good friend who was a very close friend of Judge Pregerson. Fleming and Barron invented a fictional person named George Ashley, who they instructed Hauser to represent was a millionaire art dealer who was a very close friend of Judge Pregerson. The decision to create the Ashley character was made by Fleming and Barron. Marcello was then informed by Hauser of his purported relationship with Ashley. To lend credence to Hauser's representations regarding Ashley's friendship with the judge, the FBI also furnished Hauser with background information on Judge Pregerson and his family that was obtained from FBI files of a routine background check of Judge Pregerson in connection with his appointment to the federal bench.

On October 25, 1979, Hauser attended a meeting at which Marcello, Rizzuto and Sciortino were present at the home of Marcello's brother in Louisiana. The FBI and Strike Force Attorney Henderson were aware of the planned meeting, but prior to Hauser's arrival at the meeting, neither he nor any of the government agents involved in this investigation knew that Sciortino would be present at that meeting. At that meeting, Hauser told the defendants that his friend Ashley (the fictional character) could talk with Judge Pregerson regarding Sciortino's upcoming trial in the *Brooklier* matter. A discussion ensued among all those present regarding the possibility of Ashley approaching the judge without causing him to disqualify himself from

Sciortino's case, and what he should be told regarding Sciortino. At the October 25 meeting, Hauser and Sciortino met alone for a time, during which Sciortino stated to Hauser that he was innocent of the crimes with which he was charged in the pending case, and that he believed that Judge Pregerson was a fair and honest judge. He stated his concern that Judge Pregerson would have to leave the district court as a result of his appointment to the Court of Appeals, and would not preside over his trial.

The consensual tape of the October 25 meeting was then reviewed by the FBI agents, and Strike Force Attorney Henderson was informed about the meeting. Henderson testified that he may have listened to the tape of the meeting between then and October 29. Agent Barron discussed the October 25 meeting with Henderson in order to obtain legal advice on how to proceed with the investigation. A meeting was then held between Agents Fleming and Barron, and other FBI personnel and Hauser on October 29. Hauser was instructed to arrange a meeting with Sciortino, and was told to inform Sciortino that Judge Pregerson would accept an art object valued at $125,000 from Sciortino in exchange for a promise not to withdraw from the case and a guarantee of probation in the event he was convicted.

Hauser then arranged a meeting with Sciortino that took place on October 29, 1979 in West Covina, California. At that meeting he told Sciortino that Judge Pregerson did not trust Sciortino and that he wanted to "get something" from Sciortino. He told Sciortino that the judge would not withdraw from the case and would guarantee Sciortino and two of his codefendants probation in exchange for a painting. As part of the scenario, he also told Sciortino that Judge Pregerson had previously taken a bribe in a drug case over which he presided. At that meeting Sciortino agreed to furnish a bribe to Judge Pregerson. Agents Fleming and Barron testified that they did not instruct Hauser to tell Sciortino that the Judge did not trust him, and did

not specifically tell him to tell Sciortino that the judge had been bribed in the past, although Agent Fleming testified that that statement by Hauser was consistent with the instructions he was given. All of Hauser's statements to the defendants regarding Judge Pregerson are, of course, untrue and were part of a fictional scenario.

Subsequent to the meeting of October 29, other conversations took place between the defendants and the defendants and Hauser regarding the furnishing of the art object or cash to Judge Pregerson. No bribe was ever furnished; Judge Pregerson was not aware of the conspiracy until he was informed of it by the Justice Department by means of the government's *ex parte* motion dated November 15, 1979.

The essence of the defendants' position is that the actions of the government in instructing Hauser to pursue the matter of Marcello's interest in Judge Pregerson after the conversation of October 4, 1979, and the conversation between Hauser and Sciortino on October 29, 1979, constitute conduct so outrageous that the indictment in this matter must be dismissed. Sciortino and Marcello presented entrapment defenses at trial. The jury apparently rejected this defense entirely with regard to Marcello, convicting him on all counts. Sciortino, on the other hand, was only convicted on the second count.

Two United States Supreme Court cases have recognized a defense based upon a due process violation as the result of governmental overreaching, although the Supreme Court has not overturned a conviction on that basis, nor has it specifically delineated the scope of the defense. In *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), the defendant argued that, because the government had furnished him with a legal substance necessary to the manufacture of methamphetamine, that the government was guilty of impermissible conduct which barred his conviction. The Court rejected this argument, stating:

> While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous

that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction ... the instant case is distinctly not of that breed .... The law enforcement conduct here stops far short of violating that 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment.

*Id.* at 431–32, 93 S.Ct. at 1642–43 (citations omitted).

In *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), the defendant contended that the government supplying of contraband to one subsequently prosecuted for trafficking in that contraband was a *per se* violation of due process. The majority of the Court rejected that view, but concluded that the mere fact that a defendant is predisposed to commit a crime does not necessarily bar the assertion of a due process defense based on outrageous government behavior. *Id.* at 492–93, 96 S.Ct. at 1651 (Powell, concurring). The delineation of the limits on police involvement in crime is still an open question. *Id.* at 494, 96 S.Ct. at 1652.

The Ninth Circuit Court of Appeals has recognized a defense based upon a due process violation as a result of outrageous governmental conduct. In a pre-*Russell* case, the court sustained an attack on a conviction on due process grounds, notwithstanding the fact that the defendant was predisposed to commit the offense. *See Greene v. United States*, 454 F.2d 783 (9th Cir. 1971). That case involved a conviction for bootlegging which occurred following numerous contacts by a government agent after the defendant had served a sentence for a conviction arising out of the same agent's undercover activities. The only person that the defendant ever sold the illegal alcohol to following his first conviction was the government agent. In holding that due process considerations barred the conviction, the court cited the following factors: That the agent had reestablished contact with the defendant after his previous undercover work was completed; that the

course of events leading to the arrest spanned two and one-half years; that the involvement of the agent was substantial in that he treated the defendant as a partner and furnished him with equipment and a site for the still; that the agent exerted pressure on the defendant in the nature of a veiled threat; that the agent reestablished and sustained the criminal operation; and that the agent was the only customer of the criminal operation. *Id.* at 786–87. The court noted that it was the combination of factors, as opposed to any one factor, that mandated a reversal of the conviction. *Id.* at 786. In setting forth its holding, the court stated, "We do not believe the Government may involve itself so directly and continuously over such a long period of time in the creation and maintenance of criminal operations, and yet prosecute its collaborators." *Id.* at 787.

In *United States v. Prairie*, 572 F.2d 1316 (9th Cir. 1978), the court found continued vitality in the defense of governmental overreaching, notwithstanding the disapproval of that defense in the plurality opinion in the *Hampton* case. The defense presents a question of law for the court. *United States v. McQuin*, 612 F.2d 1193 (9th Cir.), *cert. denied*, 445 U.S. 955, 100 S.Ct. 1608, 63 L.Ed.2d 791, *cert. denied sub nom. Johnson v. United States*, 445 U.S. 954, 100 S.Ct. 1607, 63 L.Ed.2d 791 (1980).

■ It is clear that defendants are not precluded from asserting the defense of governmental overreaching on this motion merely because they were convicted after two of them presented an entrapment defense to the jury. *See United States v. Wylie*, 625 F.2d 1371, 1377 (9th Cir. 1980), *cert. denied sub nom. Perluss v. United States*, 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981); *United States v. Prairie*, 572 F.2d at 1318–19; *United States v. Twigg*, 588 F.2d 373, 378–79 (3d Cir. 1978); *United States v. Batres-Santolino*, 521 F.Supp. 744, 750 (N.D.Cal.1981). The defendants' predisposition to commit a crime or their involvement in prior or ongoing criminal activity is relevant, however, in making a determination whether it was the government that created and maintained criminal activity. *See United States v. Wylie*, 625 F.2d at 1378; *United States v. Batres-Santolino*, 521 F.Supp. at 751 and n. 6.

The defense of governmental overreaching focuses on the outrageousness of the governmental conduct as opposed to the creativity of the government agents in their involvement. Any consideration of governmental creativity is secondary. *See United States v. Wylie*, 625 F.2d at 1377, n.7. A more stringent standard applies in considering whether a showing has been made of a due process violation based upon governmental overreaching than is applied to the defense of entrapment. *See United States v. Batres-Santolino*, 521 F.Supp. at 750. This circuit requires that the conduct of the government be *malum in se*, or that the government agents engineer and direct the criminal operation from start to finish. *See United States v. Gonzalez*, 539 F.2d 1238 (9th Cir. 1976) (per curiam). In the *Gonzalez* case the Court stated, "Only such extreme conduct could arguably constitute a due process violation.... The Constitution ... does not guarantee would-be criminals that they will be safe from errors in judgment." *Id.* at 1240. *See also United States v. Wylie*, 625 F.2d at 1377 (government may use informants and pay them); *United States v. Gonzales-Benitez*, 537 F.2d 1051 (9th Cir.), *cert. denied*, 429 U.S. 923, 97 S.Ct. 323, 50 L.Ed.2d 291 (1976) (supplying contraband to a defendant not in and of itself outrageous conduct); *United States v. Jannotti*, 673 F.2d 578 (3d Cir. 1982) (en banc), *reversing*, 501 F.Supp. 1182 (E.D.Pa. 1980) (government providing large financial inducements to defendants in municipal bribery scheme not violative of due process).

In *United States v. Reynoso-Ulloa*, 548 F.2d 1329 (9th Cir. 1977), the court rejected a due process attack on a conviction brought on the ground that the government agent involved had threatened to kill the defendant if he failed to carry out a heroin transaction. The court held that the threat "must be viewed in the context of the vulgarity and 'puffing' engaged in by all par-

ticipants in the transaction." *Id.* at 1339. The court noted that this threat was an isolated incident in over two months of negotiations during which many false claims and veiled threats were made. *Id.* A similar claim was rejected in a case involving a bank robbery. *See United States v. McQuin*, 612 F.2d at 1196.

Given the high threshold a defendant must cross in order to prevail on the defense of governmental overreaching, only in rare cases has the defense been successfully asserted. In *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978), the court reversed convictions of charges involving the manufacture of methamphetamine. There the Drug Enforcement Administration, with the cooperation of a convicted illicit drug manufacturer seeking to reduce the severity of his sentence, initiated contact with the defendants, and suggested the establishment of an illegal drug factory. After eliciting the assent of the defendants to establishing this enterprise, the government and its agents supplied all necessary materials, a site at which to establish the factory, and all necessary expertise. In reversing the convictions, the court noted that, unlike other cases rejecting the defense, in this case there was no ongoing laboratory, the plan did not originate with the defendants, and neither of the defendants had the necessary expertise to manufacture the drugs. *See id.* at 381.

In *United States v. Batres-Santolino*, 521 F.Supp. 744 (N.D.Cal.1981), the court dismissed a cocaine conspiracy case prior to trial because of governmental overreaching. The court noted that in the *Russell* case, the Supreme Court stated that infiltration by the government into criminal activities was permissible, but that "infiltration" implies there is an organization to infiltrate. *Id.* at 751. The government supplied all the drugs and the defendants had no prior experience in the importation of cocaine prior to their involvement with agents of the government. The defendants' lack of prior criminal involvement was considered in determining whether it was the government or the defendant who instigated the crime. *Id.* The court noted that, while the defend-

ants were not without culpability, "they were not embarked or about to embark on any criminal activity until the government's agents set in motion the operation." *Id.* at 752.

■ Defendants attempt to portray themselves as non-culpable victims of the government's attempts to embroil them in an attempt to bribe Judge Pregerson. This is not a case like *Batres-Santalino* where the defendants had no prior criminal involvement, and were not about to embark on any criminal activities when the government agents induced them to become involved in international drug smuggling. In this case, Marcello and Sciortino were both convicted felons. Marcello was the subject of a huge government undercover investigation into bribery of public officials in Louisiana. Sciortino had been indicted for extortion and murder. Rizzuto was known to be a close associate of Marcello. While these facts are not dispositive, they are relevant in determining whether it was the government that instigated the criminal activity directed toward Judge Pregerson.

The initial contact between the defendants and the government regarding Judge Pregerson and the *Brooklier* case was initiated by defendant Marcello during the October 4, 1979 conversation and not by the government informant. The meeting of October 25, 1979, at which discussions regarding an approach to the judge were had, was arranged by the defendants; the record is clear that Hauser did not know that he was to meet with Sciortino at that meeting. The government's interest in investigating further following Marcello's initial interest in Judge Pregerson, particularly in light of his expressed interest in the *Brooklier* case, can hardly be characterized as inappropriate. Nor did the government act impermissibly in creating a scenario which would permit the defendants to believe they could make contact with the judge regarding Sciortino's case.

Defendants complain that Hauser's statements to Sciortino during the meeting of October 29 are tantamount to a threat that

if Sciortino did not pay a bribe, he would be convicted and sent to prison.[2] The record does not support this assertion. Hauser's statement that the judge did not trust Sciortino, when viewed in the context of all the meetings and conversations among the defendants and Hauser, does not amount to outrageous government conduct. *See United States v. Reynoso-Ulloa*, 548 F.2d at 1339.

The defendants have failed to make a showing that the actions of the government were so outrageous as to violate their rights to due process of law. It is permissible for the government to use artifice and stratagem to ferret out criminal activity. *See Sorrells v. United States*, 287 U.S. 435, 441, 53 S.Ct. 210, 212, 77 L.Ed. 413 (1932). No more than that was done here.

Accordingly, defendants' motion to dismiss is and was properly DENIED.

---

**2.** Defendants have placed a great deal of emphasis on Hauser's statements to Sciortino at the meeting of October 29, 1979 as a basis for this motion. Even if the scenario under which Hauser furnished Sciortino a purported opportunity to bribe the judge was outrageous, and we conclude it was not, there is no evidence that Marcello or Rizzuto were ever aware of anything about that conversation except Hauser's untrue statement that the judge would take a bribe.