UNITED STATES of America, Plaintiff,

v.

Howard GORDON, Defendant.

Crim. No. 89–80601.

United States District Court,
E.D. Michigan, S.D.

Aug. 31, 1990.

Terrence G. Berg, U.S. Attorney's Office, Detroit, Mich., for plaintiff.

Seymour Berger, Detroit, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER

ANNA DIGGS TAYLOR, District Judge.

Defendant, Howard Gordon, was indicted on one count of being a felon in possession of a firearm in contravention of 18 U.S.C. § 922(g).[1] Defendant is alleged to have illegally possessed an AK–47 semi-automatic assault rifle during the sale of said weapon in an undercover operation executed by special agents of the Bureau of Alcohol, Tobacco and Firearms (ATF) on August 28, 1989, in the City of Detroit.

He is alleged to have possessed the weapon as a result of his efforts to procure it for Sal Salvatore,[2] the Government's confidential informant. In asserting entrapment as his defense, he maintains that but for the insistence of Salvatore, he would not have attempted to acquire, and in turn, possess the rifle. Defendant voluntarily waived his constitutional right to a trial by jury and elected to have his case tried to the Court.

1.  18 U.S.C. § 922(g) provides, in relevant part, that:
    "It shall be unlawful for any person—
    (1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;
    to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."

2.  Sal Salvatore is not this individual's true name. Because of his involvement in ongoing investigations with law enforcement authorities, however, it was stipulated to by the parties that the name Sal Salvatore would be used for purposes of this trial.

This writing constitutes the findings of fact and conclusions of law upon which the Court bases its finding of guilt in the within matter.

Defendant and Salvatore first became acquainted while cellmates in February of 1989 during a one month stay in the Oakland County Jail. During this period of incarceration, conversations were had between the two of them regarding Defendant's job at a local armory and his ability to procure weapons as a result. Defendant informed Salvatore that he could get a variety of weapons.

Salvatore was released several weeks before Defendant, but during this time they maintained contact and Salvatore was made aware of Defendant's release date. At some point before his release, Defendant informed Salvatore that he could get him a box of Uzi machine guns and hand grenades. Salvatore, in turn, informed ATF special agent Michael Yott, with whom he was cooperating, of Defendant's offer and agent Yott initiated an investigation of Defendant because it was illegal for any civilian to possess a fully automatic weapon. Defendant, however, contacted Salvatore on August 28th to tell him that he would be unable to secure the machine guns and grenades, but that he would be able to get a fully automatic AK–47 assault rifle for a price of $700.00, $50.00 of which was to be his brokerage fee. On the next day, the morning of August 29th, Salvatore went to the ATF office and was instructed to contact Defendant in order to arrange the buy for the rifle. They tried to arrange the deal for that morning but Defendant could not be reached. Eventually, Defendant was contacted and it was arranged that the buy would take place that evening at 6:00 p.m. at a McDonald's Restaurant on Eight Mile Road, near his home.

Salvatore and ATF special agent Donna Sanders, posing as his girlfriend, were waiting in a parked car at the McDonald's when Defendant appeared. Agent Sanders was electronically wired for sound and agent Yott provided surveillance from a nearby vehicle. Upon entering the car, Defendant explained that he did not have the rifle, but that he would direct them to a place at which they could obtain it. Agent Sanders, who was driving the vehicle, was directed to a house at 9966 Schaeffer. When they arrived at this address, Defendant got out of the car and went to the house whereupon a man later identified as Charles Stewart emerged. Both Defendant and Stewart returned to the undercover vehicle, but neither was in possession of the weapon. The four of them then proceeded to a house at 697 Lawrence, where it was believed that the weapon would be available. Upon arrival at this address, agent Sanders was directed by Defendant not to park directly in front of the house, but rather several yards ahead. Agent Sanders testified that she could see, through her rearview mirror, Defendant and Stewart on the porch of the house talking on a cordless telephone. When the telephone call had been concluded, Defendant returned to the car while Stewart remained on the porch. Defendant announced that James Williams, a fifth person, would be bringing the weapon. A short time later, a green Pontiac containing one person arrived. That person was later identified as James Williams. Williams, however, did not have the weapon with him. After a brief discussion among Defendant, Williams and Stewart, Stewart and Williams left in the green Pontiac.

Approximately thirty minutes later, the green Pontiac returned and parked directly behind the undercover vehicle. Defendant, who had been waiting in the car with Salvatore and agent Sanders, got out to meet Williams. Williams then approached the car to ask agent Sanders for the money, and as he approached, agent Sanders observed the handle of a hand gun in his waistband. She had refused to turn over the money until she saw the rifle. It was at this point that Defendant, who had been standing next to the green Pontiac, reached into that car, pulled out a black plastic bag which appeared to contain a rifle, and started toward the undercover vehicle. Agent Sanders then gave the "take down" signal to agent Yott, who had been monitoring the entire series of events. He then pulled up in his vehicle to make the arrest. Defen-

dant dropped the plastic bag and began to run. Agent Yott gave chase and subdued Gordon a short distance from the parked cars. When Defendant was returned to the scene, the black plastic bag was opened and a loaded semi-automatic AK–47 assault rifle was discovered, not the fully automatic weapon for which the parties had bargained.

█ In order to obtain a conviction pursuant to 18 U.S.C. § 922(g), the Government must establish, beyond a reasonable doubt, the following elements of the crime: 1) that Defendant was a convicted felon; that is, that he was previously convicted of a crime punishable by a term of imprisonment exceeding one (1) year; 2) that he was knowingly in possession of a firearm; and 3) that said firearm had travelled in interstate commerce. *United States v. Rumney*, 867 F.2d 714, 721 (1st Cir.1989), *citing, United States v. Robinson*, 756 F.2d 56, 58 (8th Cir.1985). All three prongs of this test are easily satisfied.

█ On May 31, 1989, in the Oakland County Circuit Court, Defendant pled guilty to a charge of attempt unarmed robbery and resisting arrest, a felony punishable under Michigan law by a term of imprisonment exceeding one (1) year. Said guilty plea, which was accepted by the court, constitutes a conviction, as Defendant so acknowledged. See *United States v. Broce*, 488 U.S. 563, 109 S.Ct. 757, 102 L.Ed.2d 927 (1989); *Gray v. C.I.R.*, 708 F.2d 243 (6th Cir.1983), *cert. denied*, 466 U.S. 927, 104 S.Ct. 1709, 80 L.Ed.2d 182 (1984). The Court finds Defendant's testimony to the contrary to be neither plausible nor credible. In accordance with an Order Delaying Sentence scheduling his sentencing for May 22, 1990, Defendant was given the equivalent of probation. During this period, he was prohibited from violating any criminal law of any unit of government, from leaving the state without the consent of the Circuit Court, and he was required to report regularly to his assigned probation officer.

Defendant attempted to cast doubt on the validity of his plea by pointing out that the agreement was signed by neither the prosecutor nor the judge. Pamela Mass, the Assistant Oakland County Prosecutor who negotiated this plea, testified however, that neither the signature of the Assistant Prosecuting Attorney nor the judge are required for a valid plea. After reviewing the agreement, received into evidence as Government's exhibit # 3, the Court finds no reason to question its authenticity or validity. Defendant acknowledged that his signature appeared on the document, and further, the seal of the Oakland County Circuit Court was affixed thereto. Moreover, the Court observed that the document does not provide signature lines for either the prosecuting attorney or the judge, only for the defendant and his/her attorney. Therefore, it is clear that at the time that Defendant was alleged to have been in possession of the AK–47 rifle, he was a previously convicted felon.

That Defendant was knowingly in possession of the firearm is equally indisputable. He was observed holding the black plastic bag containing the weapon by three eyewitnesses: agent Sanders, agent Yott, and Salvatore. Additionally, by his own admission, he went to the green Pontiac, removed the gun, and carried it to the undercover vehicle to complete the deal. Although he discarded it shortly thereafter in his efforts to evade arrest, the brevity of his possession is irrelevant. Defendant further asserted that he believed there to be nothing illegal about selling the rifle. This argument too, is futile. Whether or not the mere selling of the rifle was legal or illegal is immaterial to the fact that Gordon was prohibited from possessing any weapons due to his status as a previously convicted felon. 18 U.S.C. § 922(g), *supra*. Furthermore, Defendant's claims of not knowing the law and that he thought the weapon was merely a rifle, totally lack credibility. Testimony from agent Sanders indicated that Defendant claimed to have been brokering a fully automatic weapon, which is unlawful for any private citizen to possess. Also significant is the clandestine nature of the events surrounding the entire transaction. Viewed in their totality, they demonstrate that Defendant was well

aware that this was not a purchase permitted by law. The covert actions taken by Defendant and his associates to avoid detection are illustrative of this fact. No one had the rifle on their person, and it was not retrieved until the participants were satisfied that it was safe. Throughout the car ride, Defendant continuously looked about and expressed concern with regard to the possibility that they were being followed. In fact, agent Yott testified that one of the undercover vehicles had to discontinue its surveillance when they heard over agent Sander's wire that Defendant had identified it. Had Defendant believed the sale to be legal, he would not have exhibited the nervousness or taken the precautions that he did. The final element of the offense which the Government must establish is that the rifle has travelled in interstate commerce. The Government's firearm expert, ATF special agent Timothy Sullivan, testified that the rifle in question was manufactured in the Peoples' Republic of China and imported to the state of Georgia. This information was gleaned from the rifle itself. Therefore, the fact that it is presently located in the state of Michigan establishes the requisite nexus between the rifle and interstate commerce.

■ Having determined that the Government has met its burden of proof beyond a reasonable doubt, the only issue remaining before the Court is whether Defendant's claim of entrapment justifies acquittal. The Court finds that it does not.

Essentially, Defendant maintains that he became involved in the deal to sell the rifle only at the urging of Salvatore and that he lacked, therefore, the requisite predisposition to commit the crime. First, he denied having ever told Salvatore while in jail that he could get hand grenades and machine guns. He admitted that he and Salvatore maintained contact following his release, but asserted that it was simply a consequence of their attending Alcoholics' Anonymous meetings together. Defendant maintained that Salvatore constantly called his house inquiring about the weapons and that he repeatedly told him that he could not get machine guns. Finally, in an effort to mollify Salvatore, Defendant agreed to get the weapons for him. He also denied having called Salvatore to tell him that the machine guns and grenades would not be obtainable, but that he could get an automatic machine gun. He further denied having had any discussions concerning price. That aspect of the deal, according to Defendant, was handled by Stewart. He never told Salvatore that he was to receive fifty dollars from the sale price. Defendant also testified that he had not known Williams prior to August 29, 1989. This testimony was impeached, however, by agent Sanders when she stated that Defendant had indicated to her that he knew both Stewart and Williams well.

The Supreme Court has spoken definitively on the defense of entrapment. See *Sorrells v. United States*, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932); *Sherman v. United States*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958); *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976). The Court has held that the focal point of the analysis is the predisposition of the defendant, rather than the nature of the Government's conduct. See also, *United States v. Robinson*, 763 F.2d 778 (6th Cir.1985). The Court, however, has also admonished that "while [a]rtiface and stratagem may be employed to catch those engaged in criminal enterprises," it is impermissible for the Government to "implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute". *United States v. Reynoso–Ulloa*, 548 F.2d 1329, 1334 (9th Cir. 1977), *citing, Sorrells*, 287 U.S. at 441–42, 53 S.Ct. at 212–13.

In *Sorrells*, the defendant was charged with selling a half-gallon of whiskey to a prohibition agent in violation of the National Prohibition Act. The Court determined that as a result of the "repeated and persistent solicitation" by the agent, the defendant was entitled to the defense of entrapment as a matter of statutory construction. Therein the Court established the principle that the Government could not punish an

individual for the commission of a crime which was the result of its own creative activity. *Reynoso–Ulloa,* at 1334, *citing, Sorrells,* 287 U.S. at 451, 53 S.Ct. at 216. More recently in *Hampton,* the Court reiterated that the entrapment defense is predicated upon the defendant's lack of predisposition. There, the defendant was convicted of distributing cocaine which he claimed had been supplied to him by a Government informant. The Court ruled that the Government's conduct had not been so outrageous as to offend notions of due process or bar conviction. *Reynoso–Ulloa,* at 1335, *citing, Hampton,* 425 U.S. at 490, 96 S.Ct. at 1650.

Although it is clear that lack of predisposition is the cornerstone of the entrapment defense, the meaning of "predisposition" is less obvious. *Sorrells* and *Sherman* suggest several factors to be considered when determining whether the defendant was an otherwise innocent person in whom the Government had implanted the criminal design.

> Among these [factors] are the character or reputation of the defendant, including any prior criminal record; whether the suggestion of the criminal activity was initially made by the Government; whether the defendant was engaged in the criminal activity for profit; whether the defendant evidenced reluctance to commit the offense, overcome only by repeated Government inducement or persuasion; and the nature of the inducement or persuasion supplied by the Government.

*Reynoso–Ulloa* at 1336.

After viewing the totality of the circumstances in light of these factors, the Court concludes that the actions of the Government in this case did not abrogate Defendant's right to due process, and therefore did not amount to entrapment. Defendant was clearly predisposed to committing this crime and did not do so merely at the behest of the Government, through its agent, Salvatore. His assertions that he provided the weapon only in response to Salvatore's harassment are not credible. For example, Defendant testified that he

had had no trouble refusing Salvatore's earlier attempts to procure illegal drugs by telling him that he did not deal in them. He easily could have done the same with regard to the rifle. Further, agent Yott testified that when he listened to the conversation between Defendant and Salvatore arranging the buy, he heard not reluctance, but concerns that the purchasers arrive on time. These are not the actions of an unwilling participant. Defendant also testified to his ability to "introduce Sal personally" to the proprietor of the armory gun and knife shows, to obtain a rifle. Defendant's claimed familiarity with the marketing of weapons at the armory is totally inconsistent with his claim that he never knew there was anything unlawful about the transaction which he arranged.

On the other hand, the Court does fully credit Salvatore's testimony that while in jail, Defendant bragged to him about his ability to broker weapons. Also, agent Sanders testified that Defendant had claimed to be brokering a fully automatic machine gun. It is highly unlikely then, that he believed that the object he delivered in the black plastic bag was a mere rifle, which he had allegedly told agent Sanders and Salvatore that they could buy at the armory. If the weapon could have been purchased at the armory, there would have been no need for the mysterious and secretive actions taken on the evening of August 29th. At any rate, he clearly knew that it was a firearm.

Defendant pointed to constant telephone calls made to his home by Salvatore as evidence of the Government's overreaching in this matter. To the contrary, however, the constant calls to his home suggest that Salvatore was being encouraged to expect delivery of a weapon or weapons. It also lends credence to Salvatore's testimony that a case of Uzis had previously been promised. This view is buttressed by the fact that the overwhelming majority of the calls allegedly made by Salvatore to Defendant's home were prior to Salvatore's involvement with agent Yott. Agent Yott testified that Salvatore had not begun working with him until late July or early August, 1989. Moreover, Salvatore did not

154

approach agent Yott with the information regarding the case of Uzis and hand grenades until three or four days prior to Defendant's arrest.

Finally, even though the consideration which Gordon arranged for his brokerage was only $50.00, it clearly evidences his willingness to go forward with the deal. It is important to note that he risked his liberty for this small fee, which he set himself. It was not offered by the Government as an overwhelming enticement to engage in criminal activity. Defendant was inclined to commit the crime as shown by the conversation between him and Stewart regarding previous deals that had fallen through and their hope that this one would not. The Government merely provided him with the opportunity to do wrong; and he did.

Now, therefore, for all of the foregoing reasons,

IT IS ORDERED that Defendant be and hereby is found GUILTY of the offense of being a felon in possession of a firearm, as charged in the indictment, in contravention of 18 U.S.C. § 922(g).

IT IS SO ORDERED.